239 F.3d 456 (2nd Cir. 2001)
 MARK ABDU BRISSON, RONALD H. BUCHNER, GORDON BURGESS, ROBERT BURKE, THOMAS D. CALLAHAN, THOMAS F. CAREY, DALE E. CARMAN, LOUIS CARRARA, T. BARRY CASEY, LAMAR CASON, ROBERT T. CASSIDY, ROBERT CHANGERY, LARRY E. CHAPPEL, RICHARD CHARBONNEAU, STANLEY CHECKOWAY, DOUGLAS S. CHRISTENSEN, LEE J. CHURCH, JAMES CIRILLI, ROBERT CLACK, WALTER M. CLARK, PHILIP CLAUDY, HAROLD T. CLEAVER, CHARLES CLEMENTS, RICHARD T. CLOUGH, LAWRENCE D. COBB, WESLEY COLLINS, RONALD E. COMBEE, EUGENE M. COMFORT, HARRY G. COMPTON, JOHN C. COOK, CLIFFORD COOL, DAVID L. COOPER, DONALD C. CORY, MARCUS COVINGTON, EUGENE COX, LYNN COX, LYNN O. COX, HOWARD CROWELL, J. N. CRUMP, CHARLES CRUMPTON, JOSEPH C. CUSHING, EDWARD CYWINSKI, THOMAS G. DAHONEY, JOSEPH DALTON, CHARLES R. DAVIS, GERALD E. DAVIS, WADE L. DAVIS, THOMAS A. DEAN, ERNEST E. DELL, JR., THOMAS J. DELNICKAS, HENRY P. DENONCOUR, ROBERT DEVRIES, CLARENCE J. DIETER, CHARLES DIKE, JR., GERALD DION, JACK DITZEL, STEPHEN A. DODGE, WILLIAM W. DONNELLY, WILFREDO H. DORNA, WILLIAM DORNA, CHARLES B. DOUGLAS, ROBERT H. DROZD, VINCENT L. DUFFY, RALPH DUNN, RICHARD C. DUPUIS, ROBERT DURANT, PATRICK W. DWYER, ROBERT R. DZIMIDAS, ROBERT EBBLER, JACK E. ELDRED, KENNETH ELIAS, WILLIAM C. ELLIS, DANNY A. ENDRESEN, LEWIS W. ENGLISH, R. ROBERT ENGLISH, SIGURD ERIKSEN, JOHN M. ESPOSITO, DOUGLAS S. EYRE, DOUGLAS L. EZELL, JOHN R. FAHY, JEFFREY FAIRBROTHER, ANDRAL P. FARIS, ROBERT FERREL, LEWIS FIELACK, JERRY D. FIFER, JAMES FLAUGH, EUGENE FORET, RICHARD FORTE, DUANE FOSTER, FRANCIS J. FOSTER, DAVID FOUNTAIN, GEORGE V. FOX, ROLAND M. FRAGA, ROBERT A. FRASER, BRUCE L. FRYE, JOHN FUCIK, PAUL J. FULLER, EDWARD R. FULLERTON, JOHN GALLAGHER, RODGER P. GALLI, FREDERICK C. GARDNER, CHARLES L. GARNER, EDWIN J. GEIGER, JAMES T. GETTYS, FRANK H. GIBSON, JOHN GROUT, ROBERT P. GUNST, WILLIAM HALVOSA, III, D. B. HAMAN, LLOYD HAMILTON, ROSS M. HAMILTON, ROBERTO HANCHETT, MICHAEL D. HANLEY, ALVIN C. HANSON, ROBERT HARLAN, GARY HARMON, GARY L. HARRIS, ROBERT S. HARRIS, DAN H. HARRISON, NILE L. HARTER, JOSEPH HASELBY, WILLIAM HERNDON, DONALD C. HERTZFELDT, LARRY HESS, LON HICKS, CARL E. HINDLE, RICHARD HOHLOWSKI, FREDERICK W. HOLTGRAVE, DANIEL E. HOOD, WILLIAM N. HOOVER, MICHAEL R. HOPKINS, DARRYL G. HUBBARD, JOHN E. HUBBARD, STANLEY C. HUIE, ARNOLD HUSEMAN, O. H. HUTCHINS, RAYFORD HYMES, JOHN IISAGER, ANDREW C. ISOLA, A. ALLEN JACKSON, DAVID H. JENKINS, WILLIAM K. JILLSON, JAMES C. JOHNSON, PAUL F. JOHNSON, ROBERT JOHNSON, RONALD W. JOHNSON, TERRILL C. JOHNSON, J. H. JONES, M. PERRY JONES, TERRELL JONES, DEAN JUNG, HERMAN T. KAMERMAN, H. L. KARASOFF, WILLIAM G. KARNS, GARY R. KASPER, PATRICK T. KAVANAGH, RALPH B. ABRAMES, DELBERT R. ACKLEY, GEORGE ADALIAN, JOHN R. ADKINS, STEVEN A. AIGNER, JAMES AINSWORTH, DAVID R. ALBERT, WILLIAM ALLEN, CHARLES AMACKER, JOSEPH ANDERSON, JOSEPH ANDING, WILBERT Z. ANTILL, ERIC ARCHER, STUART H. ARCHER, JOSEPH A. ARMSTRONG, LEONARD R. ATLAS, GEORGE J. AVERY, CHESTER BAILEY, LARRY BAKER, JOHN M. BANDY, RICHARD BARKER, MOHAMMAD BASHIR, PETER P. BENDZLOWICZ, JOSEPH J. BENNETT, PETER BENNETT, WILLIAM O. BENNETT, DAVID BENSON, THOMAS R. BENTLEY, MICHAEL BERRY, JAMES BETHEL, ROBERT BEZIAT, GORDON
M. BIGGAR, STEPHEN P. BLANK, DAVID BLOSS, JAMES BLOYDER, CHARLES J. BONINI, MARC L. BORNN, WALTER BOSSELMAN, STEVE D. BOWDEN, NED C. BOWERS, JAMES A. BOWLES, GARY W. BRANDT, STEPHEN W. BRANDT, CURTIS H. BRIGGS, DONALD BRODHEUR, STEPHEN A. BRODHECKER, ALWYN BROWN, ROBERT BROWN, JAMES BROWNE, ROBERT P. GICK, DONALD R. GIDDENS, JOSEPH A. GIDDINGS, BERNARD D. HGIERE, NORMAN GIROUARD, CHARLES F. GLADISH, THOMAS E. GOMPF, JACK D. GORDON, CORAD CONRAD GOSHEFF, ALTON G. GRAHAM, RITCHIE L. GRIFFITH, KENNETH R. GROSS, JOHN GROUT, ROBERT P. GUNST, DAVID KAWAMOTO, KEVIN P. KEHOE, RICHARD KELLY, GREG KERHULIS, H. W. KING, CHRISTOPHER KIPFER, DAVID R. KIRSCHNER, ROGER L. KLEIN, WILLIAM KLINE, RICHARD KLINICKI, STEPHEN M. KORCHECK, JOHN KUHS, WILLIAM KUNZ, ENRIQUE J. LANZ, LELAND T. LARSON, RICHARD LAUMEYER, WARNER F. LEE, ALBERT LEET, FRANK M. LENZ, IRA LESHIN, JOHN W. LEWIS, EDWARD R. LINDGREN, B. L. LINDSAY, WILLIAM H. LINKROUM, III, GORDON M. LITTLEFIELD, DAVID LOOMIS, FREDERICK LOSEN, JAMES V. LOVEN, DANIEL W. LOVETT, EDWARD J. LYNCH, M. LYON, RICHARD MACK, MICHAEL MACQUARRIE, DENNIS MADDUX, EDWARD A. MAIELLARO, ROBERT MANSKE, SIDNEY S. MARGREY, ANTHONY MARMON, FRANK MARTIN, RODERICK MARTINDALE, JOHN H. MASCALI, ROBERT J. MASSEY, ROBERT PAUL MASSI, MICHAEL M. MATEI, BRIAN P. MATTHIESEN, RICHARD MAYER, DALE Q. MAYO, THOMAS MAYS, BENEDICT L. MCALEVEY, GUY L. MCCAFFERTY, PATRICK MCCALLUM, JIM M. MCCONNELL, ROBERT B. MCEACHRAN, JAMES MCFARLENE, WILLIAM MCINROE, EDWARD A. MCKAY, KENNETH R. MCKEE, HUDNALLE MCLEAN, MICHAEL T. MCQUILLEN, CHRISTPHER L. MEGA, R. MERRILL, LAWRENCE E. MEYER, JAMES W. MICHEL, GORDON MILLER, GREGORY MILLER, JOSEPH P. MILLER, RICHARD L. MITTS, EINAR J. MORGENSEN, WILLIAM J. MOONEY, JAMES MOORE, MARK MOORE, ROBERT L. MOREY, PETER J. MORIARTY, EDWIN MORSE, GORDON S. MOYER, JAY MUFFETT, CHARLES F. MULIN, RICHARD MULLER, JOHN NEILL, JACK A. NELSON, JEFFREY S. NELSON, LARRY NELSON, LEONARD M. NELSON, VAN NELSON, JACKSON I. NEWBERRY, VERNON J. NORDMAN, YAN NOVAK, JOHN M. NUNEZ, JAMES R. NUSS, ROBERT OBER, STUART A. O'BRIEN, CHARLES W. O'CONNOR, MICHAEL O'DONNELL, KENNETH OLSON, LAURENCE H. OMURA, CLYDE ORR, JOHN F. O'RYAN, ROBERT L. OSBURN, LANE OVERSTREET, ROBERT B. OWENS, DENNIS A. PANZER, HENRY PAPA, THEODORE PATEASRE, JOHN C. PATTEN, BRUCE PATZMANN, RICHARD V. PAUL, FREDERICK PEARCE, PAUL PEARCE, ROBERT A. PENN, RICHARD A. PERKINS, T. C. PESTOLIS, STEPHEN T. PETERSEN, DAVID H, PETERSON, DAVID H. PETERSON, ROBERT PETERSON, KENNETH M. PFRANG, JAMES LARRY PHILLIPS, WILLIAM PICKEN, P. A. PIERCE, RICHARD PIPKIN, VINCENT PISCHL, CURTIS R. PLATTE, RICHARD P. PLATTS, DWIGHT PLYLER, JIMMIE R. POLLOCK, JOHN T. POOL, JOHN C. POPKESS, RANDAL L. PORTER, FREDERICK R. POUY, JOHN R. RAMEY, NORMAN W. REAGAN, JOHN H. REEVES, MICHAEL REICHFELD, ARNOLD REINER, FORREST RHODES, HAROLD W. RHODES, HENRY H. RHYNE, WILLIAM L. RICE, JAMES RICHARDS, HENRY RICHARDSON, JOHN B. RIEDERICH, ROBERT RIGNEY, RANDOLPH RIME, JAMES DAVID ROACH, JAMES N. ROBERTSON, RICHARD P. ROBINETTE, JACK ROCCHIO, ROBERT ROGNLIEN, WILLIAM C. ROSE, EDMOND ROUSSEAU, JOHN RUDL, KENNETH B. RUHM, TERRY RUSH, PHILIP M. RUTH, ROBERT F. SABBATINO, SALVATORE SALLIBELLO, KIT SANDERS, ANTHONY R. SAPORITO, JAMES P. SASSER, FRANK SAVINO, P. SAYERS, FRANCIS E. SCHLATER, JERRY SCHNELL, DONALD J. SCHOLTZ, PAUL W. SCHOLZ, HARRY SCHONING, ALLEN SCHWAB, JAMES G. SCHWALBERT, CARL D. SCRIVENER, LAURENCE E. SENN, RALPH M. SHAPE, JIMMY R. SHAW, MICHAEL SHEA, GEORGE SHEASLEY, T.B. SHEEHAN, JAY F. SHINN,
JIMMY H. SHUMAN, DAVID M. SIMPLER, D. B. SIOTKAS, JOHN SKINNER, JOHN E. SKOMARS, KENNETH SLOBODY, ROBERT R. SMEDLEY, JAMES SMILEY, B. STAN SMITH, CALVIN SMITH, DON P. SMITH, WAYNE A. SOLIDAY, RICHARD SOMOYA, JAMES F. SONNHALTER, EDWARD W. SPEIRS, CHARLES C. SPENCER, LEON SPINNEY, TERRY J. SPRING, ROBERT G. STALVEY, KENNETH J. STEFFAN, LEONARD A. STILLER, THOMAS J. STONE, WHITNEY STRAIN, JAMES STUART, DONALD R. STUBBS, ROBERT STURGEON, JIMMY L. TALKINGTON, CHARLES TARPLEY, JAMES R. TAYLOR, H. J. TEDESCO, PAUL T. THATCHER, JACK THOMAS, JOHN M. THOMAS, BRENDA A. THOMPSON, GEORGE F. THOMPSON, THOMAS H. TINGLE, EMMETT R. TITSHAW, HENRY TOOKE, WILLIAM W. TRAVIS, ANTHONY TRIPODI, JERRY TROTT, JAMES VANDEMARK, S. B. VANGORDER, THOMAS VANNOTE, WAYNE A. VEENEMAN, RAFEL E. VELEZ, JAMES A. VERSCHAGE, DAVID M. VIKEN, JAMES S. VITALE, LLOYD S. VOOGT, ROBERT VOSS, BRUCE A. WADIAK, JAMES WAEBER, NEAL WALDRON, JOSEPH R. WALKER, DAVID E.B. WARD, DANIEL WATROUS, RONALD WEAVER, RANDOL B. WEBB, BRIAN WEISBLAT, LARRY J. WELCH, PETER J. WENK, DONALD W. WETMORE, CURT J. WETZEL, AUSTIN WHELIHAN, JACK L. WHICKER, JAMES H. WHITE, R. O. WHITE, WILLIAM O. WHITE, J. B. WILLIAMS, C. R. WILLIAMS, J.A. WILLIS, DONALD L. WILSON, JAMES R. WILTJER, JOHN STEPHEN WOELFEL, LEONARD R. WOHLETZ, MARK M. WOHLMUTH, CLIFTON WOODWORTH, DONALD E. WRIGHT, F. E. WRIGHT, RUFUS YARBROUGH, DAVID YARRI, JAMES YORK, GORDON YOUNG, OTIS B. YOUNG, WAYNE YOUNG, FORREST ZETTERBERG, RONALD J. ZIMMERMAN, JAMES ZURCHER, JAMES BOGGS, ALAN R. CHARLEVOIS, BRUCE W. DEAN, DENNIS DOUGHERTY, BERNARD D. GIERE, RALPH L. CANDELLA, and FORMER PAN AM PILOTS JOHN DOES 489 THROUGH 700, Plaintiffs-Appellants,
v.
DELTA AIR LINES, INC. and AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Defendants-Appellees.
 Docket No. 99-9359
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: November 6, 2000
Decided: February 12, 2001
 
 Plaintiffs appeal from an order and accompanying judgment of the United States District Court for the Southern District of New York (Baer, J.), granting defendant's motion for summary judgment and dismissing the complaint.
 AFFIRMED. [Copyrighted Material Omitted][Copyrighted Material Omitted]
 EDWARD J.M. LITTLE, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., New York, NY, (William B. Fleming, Michael J. Ramos, of counsel) for Plaintiffs-Appellants.
 WILLIAM H. BOICE, Kilpatrick Stockton LLP, Atlanta, GA, (Stephen E. Hudson, of counsel; Thomas C. French, Law Department, Delta Air Lines, Inc., of counsel) for Defendant-Appellee Delta Air Lines, Inc.
 Before: KEARSE, McLAUGHLIN, and STRAUB, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 Plaintiffs are several hundred pilots who were employed by the now-defunct Pan American World Airways, Inc. ("Pan Am"). They were hired by Delta Air Lines, Inc. ("Delta") pursuant to an Asset Purchase Agreement between the two airlines. The pilots filed an age discrimination action in New York State Supreme Court challenging three specific terms of their employment with Delta. Delta removed the case to the United States District Court for the Southern District of New York (Baer, J.), and eventually filed a motion for summary judgment. The district court granted Delta's motion, finding that Plaintiffs had failed to establish a prima facie case of age discrimination, and dismissed Plaintiffs' complaint. Plaintiffs now appeal.
 
 
 2
 We hold that, while the district court erroneously concluded that Plaintiffs had not met their prima facie burden, summary judgment for Delta was nevertheless appropriate because Plaintiffs adduced no evidence that Delta's legitimate non-discriminatory explanations for each of the challenged employment terms were false. Accordingly, we affirm the decision of the district court.
 
 BACKGROUND
 A. Facts
 
 3
 This age discrimination action against Delta has an unlikely origin, rising, as it does, from the ashes of the bankruptcy of Pan Am. In January 1991, Pan Am finally succumbed to two years of crushing financial pressures caused by the bombing of Pan Am Flight 103 over Lockerbie, Scotland, and the dismal economic conditions that followed. Seeking protection from its creditors, Pan Am filed for bankruptcy under Chapter 11 of the Bankruptcy Code.
 
 
 4
 In its attempt to hammer out a reorganization plan, Pan Am contemplated the sale of some or all of its assets. By the early spring of 1991, Pan Am was actively shopping its assets to its competitors. Pan Am representatives met with several senior officers of Delta to pitch Pan Am's assets. Included in Pan Am's written presentation was a chart demonstrating that Pan Am expected half of its pilot force to retire within five years, (compared to only about 12% at Delta). Presumably, this was viewed as a selling point because it anticipated a reduced cost structure down the road for whoever purchased Pan Am's assets. Shortly after that meeting, Delta began a due diligence campaign to evaluate the Pan Am assets.
 
 
 5
 The due diligence operation was headed up by Delta's Vice President of Flight Operations, Harry Alger. Alger quickly concluded that Pan Am's pilot retirement projections were too rosy, due, at least in part, to the "two-step bid down" system that Pan Am employed. A commercial airline cockpit crew includes a captain, a first officer (also known as a co-pilot), and, usually, a flight engineer (also known as a second officer). The Federal Aviation Administration ("FAA") requires that captains and first officers retire from those positions upon reaching the age of 60. A "two-step bid down" system allows captains who have reached the mandatory retirement age to "bid down" and continue to fly as flight engineers, a cockpit position that has no FAA-mandated retirement age. In 1991, Delta, by comparison, did not permit captains and first officers over the age of 60 to bid down for flight engineer positions, although it did permit them to hold ground positions with the airline. It was true that Pan Am employed many pilots approaching the age of 60, but Alger believed that few of them would, in fact, retire, surmising most would simply bid down for flight engineer positions and stay on the payroll.
 
 
 6
 In May 1991, Alger reported his conclusion to his supervisor, Rex McClelland. McClelland's notes of the conversation state that "Pan Am is burdened with a two-step bid down system and has several 'aged' flight engineers, some in their 70s and one in particular, age 72 plus (born in 1919)." In other undated notes, Alger denigrated the Pan Am personnel as a "Contaminated workforce especially since 1987." He further noted that 68 pilots were over age 60 and four were over age 70. Alger concluded that 50% of the Pan Am workforce would not retire until 2001 - not 1995 as Pan Am had advertised. In another set of undated handwritten notes, Alger, ruminating over the potential labor conflicts that could emerge out of the integration of Pan Am personnel, wrote, "Long Term potential [for labor strife] put here after the Bad Apples have long since retired."
 
 
 7
 Despite this apparent unhappiness with the age of Pan Am's cockpit personnel, Delta continued to pursue the acquisition of Pan Am assets. By July 1991, Delta had agreed in principle to pay $260 million for Pan Am's profitable transatlantic routes, the Pan Am Shuttle, which offered hourly service between Boston, New York and Washington, D.C., and the aircraft which flew those routes. (Delta's competitor airlines quickly launched a bidding war that escalated the price of the Pan Am assets dramatically.) On July 27, 1991, Delta entered into an Asset Purchase Agreement ("APA") with Pan Am whereby Delta would pay $416 million in cash and would assume certain Pan Am liabilities including $70 million in aircraft mortgages and up to $100 million of previously issued Pan Am passenger tickets on the purchased routes. The APA also provided that Delta would offer permanent employment to at least 6,600 Pan Am employees, including at least 700 of Pan Am's approximately 2,600 pilots. However, the APA specifically stated that, "Buyer [Delta] will determine in its sole discretion . . . the terms and conditions of [the Pan Am employees'] employment." On August 12, 1991, the deal was approved by the United States Bankruptcy Court for the Southern District of New York. See Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 447 (Bankr. S.D.N.Y. 1994).
 
 
 8
 The APA set up a procedure whereby Delta would first close on the Shuttle assets, and then on the Pan Am transatlantic operations shortly thereafter. Delta targeted September 1, 1991 for the closing of the Shuttle acquisition and November 1, 1991 for all remaining aspects of the APA.
 
 
 9
 Additionally, Delta's management decided that it wanted the acquisition to be a "turnkey operation" - i.e., ownership of the assets would be transferred from Pan Am to Delta without any disruption in service. Thus, the Shuttle, which would, on August 31, be a Pan Am operation, would become, on September 1, a fully functioning Delta operation. This turnkey feature would eliminate the necessity for ticket refunds and minimize passenger alienation. Delta, however, needed to overcome several obstacles before it could meet these objectives. The most formidable was the integration of Pan Am pilots into the Delta's pilot seniority list.
 
 1. Seniority Integration Methodology
 
 10
 The APA required Delta to hire at least 700 Pan Am pilots. As a practical matter - and quite apart from the APA - Delta needed to hire Pan Am pilots to fly the newly acquired transatlantic routes. This was because Pan Am's transatlantic routes were flown primarily with Airbus 310 ("A-310") aircraft, a twin-engine widebody jet. Since the A-310 makes over-ocean voyages with only two engines, the FAA mandates that pilots of that aircraft receive special training addressing the particular safety concerns presented. Delta had not owned any A-310s, and thus none of its pilots were qualified to fly that aircraft. Therefore, in order to meet its turnkey objectives, Delta needed to hire Pan Am pilots who were qualified on the A-310.
 
 
 11
 Delta had purchased, in the transatlantic routes, the cream of the Pan Am crop; and the pilots who flew those routes were among the most senior at Pan Am. For commercial airline pilots, seniority is everything. Airlines maintain seniority lists ranking each of their pilots by their length of service for the particular airline. Each month, to obtain work assignments, pilots bid for particular positions (captain, first officer, second officer), on particular aircraft, flying particular routes out of particular airports, some more desirable than others. Assignments are by seniority.
 
 
 12
 The seniority status of Delta's pilots was protected in the collective bargaining agreement Delta had with the pilots' labor union, the Air Line Pilots Association ("ALPA").[1] As is the custom in the airline industry, that agreement required Delta to place newly hired pilots at the bottom of Delta's seniority list, regardless of the length of cockpit experience the newly hired pilot may have had with other airlines. (For this reason, pilots typically spend their entire careers with a single airline; the switching costs for senior pilots are too high.) However, the senior Pan Am pilots that Delta needed made it clear that they would not leave Pan Am, even if it was in bankruptcy, if they were to be cast down to the bottom of the Delta pilot seniority list. Thus, to close the APA and meet its turnkey objectives, Delta had to negotiate a concession from ALPA that would amend the collective bargaining agreement to let Delta integrate the Pan Am pilots into the Delta seniority list.
 
 
 13
 The existing Delta pilots had to protect their own turf. They were understandably concerned that the APA and the integration of Pan Am pilots would dilute their own status on the Delta seniority list. After extensive analysis of the impact of various integration methodologies, Delta and ALPA eventually agreed on a "modified status ratio methodology" that would spread Pan Am pilots equitably throughout Delta's seniority list.
 
 
 14
 The starting point for the integration was the position held by the most senior Delta pilot of whatever aircraft was deemed to be most nearly equivalent to the A-310. Delta deemed its Boeing 767ER ("B-767ER") to be most equivalent to the A 310 because both were long haul twin-engine aircraft, although the B-767ER was not cleared for over ocean voyages. Delta's most senior B-767ER pilot occupied spot #590. Thereafter, the methodology separately integrated the Pan Am captains, first officers and flight engineers, according to a ratio based on the number of comparable positions expected to exist at Delta, in the absence of the APA, as of the end of 1992.[2] Thus, the formula called for dividing the number of Delta captain positions (at B-767ER captain level and below) anticipated to exist as of the end of 1992 - that is, 3,360 - by the number of Pan Am captains eventually hired by Delta - 286. This resulted in a ratio of approximately twelve to one. Thus, one Pan Am captain was integrated after every twelve spots beneath #590 - at #603, #616, #629, #641 and so on. After all the Pan Am captains had been integrated, the Delta first officers and flight engineers were then ratioed with their acquired Pan Am counterparts, resulting in one Pan Am position being created after each ten or eleven Delta positions throughout the remainder of the seniority list.
 
 
 15
 While the modified status ratio methodology gave the acquired Pan Am pilots enhanced bidding seniority vis-a-vis new hires, it also resulted in placing many former Pan Am pilots in spots below Delta pilots with less cockpit experience. Thus, once they moved over to Delta, several Pan Am pilots were relegated to cockpit positions, aircraft, and routes less desirable than those they had flown at Pan Am. For example, some 55-year-old Pan Am pilots found themselves flying in positions junior to 35-year-old pilots who had been with Delta their entire career. However, the Pan Am pilots were integrated in seniority order - that is, within the integrated seniority list, and thus, Pan Am pilots maintained their seniority relative to other Pan Am pilots.
 
 
 16
 On August 30, 1991, Delta and ALPA entered into a supplemental collective bargaining agreement authorizing Delta to implement the modified status ratio methodology to integrate the Pan Am pilots into the Delta seniority list on November 1, 1991, the same day that the final aspects of the acquisition were scheduled to close.
 
 
 17
 Immediately after the execution of the supplemental collective bargaining agreement, Delta began to offer employment to qualified Pan Am pilots according to their relative seniority on the Pan Am seniority list, ultimately hiring 774 Pan Am cockpit personnel. In addition to the integration methodology, Delta set two other terms of employment for the Pan Am pilots that are at issue in this case: a ten-year service requirement for fully paid post-retirement medical benefits and a pay scale that increased pay rates from Pan Am levels to Delta levels gradually over three years.
 
 2. Post-Retirement Medical Benefits
 
 18
 Years ago, Delta management had instituted a ten year service requirement before Delta would pay the full cost of a non-pilot employee's post retirement medical insurance premiums. The ten-year service requirement was eventually applied to Delta's pilots when Delta and ALPA entered into a collective bargaining agreement in October 1990. However, in August 1991, the ten-year service requirement was waived to exempt all pilots who were on the Delta seniority list as of August 27, 1991 and had reached age 50 on or before January 1, 1992.
 
 
 19
 Because the Pan Am pilots were not integrated into the seniority list until November 1, 1991, none of them qualified for this grandfather clause. As discussed above, at the time of the APA, Delta did not permit its captains and first officers to bid down for flight engineer positions after they had reached the FAA-mandated retirement age of 60. Thus, any Pan Am pilots who were over 50 at the time of the APA would not be able to qualify for fully paid post-retirement medical benefits unless they were willing to accept employment in a ground position after they turned 60.
 
 3. Pay Scale Disparity
 
 20
 Due to Pan Am's extreme financial distress when the APA deal was struck most Pan Am employees were earning significantly less than their Delta counterparts, and the pilots were no exception. When Delta offered employment to the Pan Am pilots, it did so at their pre-existing Pan Am pay rates with scheduled incremental increases to parity with Delta's pay scale spread out over three years. Delta's pilot pension benefits were calculated based upon the pilot's final average earnings (defined as the one-year average of the best 36 months' earnings over the final ten years of employment). Thus, by not immediately jumping all Pan Am employees up to the Delta pay scale, the Pan Am pilots who retired within six years of the closure of the transaction would receive a reduced pension benefit vis-a-vis a similarly situated Delta pilot.
 
 
 21
 Eventually, 774 Pan Am pilots accepted Delta's offer of employment. Because Delta offered positions according to Pan Am's seniority list, Delta ended up hiring a very senior group of pilots. Approximately 95% of the Pan Am pilots hired by Delta were age 40 or older and 70% were age 50 or older. The acquisition of the Shuttle assets closed on September 1, 1991, the remainder of the APA closed on November 1, 1991, and Delta accomplished its turnkey objectives. Pan Am, on the other hand, ceased all operations in December 1991, and one of the most venerable names in American aviation was liquidated shortly thereafter, leaving thousands of Pan Am pilots and employees not hired by Delta jobless.
 
 B. Procedural History
 
 22
 In 1994, Plaintiffs, 488 former Pan Am pilots and flight engineers who were hired by Delta, filed this suit in New York State Supreme Court alleging violations of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("State HRL") and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8 107(1)(a), (c), 107(17) ("City HRL"). They alleged that Delta had discriminated against them based upon their age by implementing the seniority list integration methodology, the ten-year service requirement for full post-retirement medical benefits and the three-year period of pay disparity. More specifically, Plaintiffs alleged that Delta knew it was hiring a group of Pan Am pilots that was, by and large, very senior, and that Delta crafted the terms of employment with the specific intent of prejudicing them vis-a-vis their largely younger Delta counterparts.
 
 
 23
 Delta removed the case to the United States District Court for the Southern District of New York (Baer, J.) on the ground that Plaintiffs' claims arose under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., insofar as the remedies sought by the Plaintiffs required the modification of a medical benefits plan. Once in federal court, Delta quickly moved for dismissal of the complaint on the ground that the claims therein were preempted by ERISA and the Airline Deregulation Act, 49 U.S.C. § 41713 ("ADA"), or alternatively, for summary judgment.
 
 
 24
 In May 1996, Judge Baer granted Delta's motion to dismiss, finding that Plaintiffs' state law claims were preempted by the ADA. See Abdu Brisson v. Delta Air Lines, Inc., 927 F. Supp. 109 (S.D.N.Y. 1996). (The district court did not at that time reach Delta's other preemption arguments or the motion for summary judgment.) The Plaintiffs timely appealed to this Court. On that appeal, Delta argued that, as a jurisdictional matter, Plaintiffs' claims were preempted by the Railway Labor Act, 45 U.S.C. § 151 et seq. ("RLA"). We reversed Judge Baer's decision based on the ADA, declining to rule on Delta's new RLA argument. We remanded to the district court for consideration of the additional preemption arguments and Delta's motion for summary judgment. See Abdu Brisson v. Delta Air Lines, Inc., 128 F.3d 77 (2d Cir. 1997).
 
 
 25
 On remand, Judge Baer, rejecting Delta's remaining preemption arguments, denied its motion to dismiss for lack of subject matter jurisdiction. See Abdu Brisson v. Delta Air Lines, Inc., No. 94 Civ. 8494 (HB), 1999 WL 64436 (S.D.N.Y. Feb. 9, 1999).
 
 
 26
 Finally, in October 1999, Judge Baer granted Delta's motion for summary judgment and dismissed all of Plaintiffs' claims on the merits. See Abdu Brisson v. Delta Air Lines, Inc., No. 94 Civ. 8494 (HB), 1999 WL 944505 (S.D.N.Y. Oct. 19, 1999). Judge Baer ruled that Plaintiffs had failed to establish a prima facie case of age discrimination as to any of the three challenged terms of employment. See id. at *3-*5. Plaintiffs now appeal that order.
 
 DISCUSSION
 A. Standard of Review
 
 27
 We review a district court's grant of summary judgment de novo. See Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000). Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A motion for summary judgment must be rejected "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When making this determination, the court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. See Weinstock, 224 F.3d at 41.
 
 
 28
 It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. This Court has stated that: "the salutary purposes of summary judgment - avoiding protracted, expensive and harassing trials - apply no less to discrimination cases than to . . . other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Much more recently, the Supreme Court "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Reeves v. Sanderson Plumbing Prods., Inc., 120 S.Ct. 2097, 2109 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)).
 
 
 29
 Further, it is axiomatic that an appellate court may affirm the judgment of the district court on any ground fairly supported by the record. See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997) (citations omitted). Thus, we may affirm a grant of summary judgment for different reasons than those relied upon by the district court. See id.
 
 B. Delta's Motion for Summary Judgment
 
 30
 The State HRL makes it unlawful for an employer "to discriminate against [an] individual in promotion, compensation or in terms, conditions, or privileges of employment, because of such individual's age." N.Y. Exec. Law § 296.3 a. The City HRL prohibits the same conduct. N.Y. City Admin. Code § 8 107(1)(a). Although there are differences between the State HRL, the City HRL and the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., age discrimination suits brought under the State HRL and City HRL are subject to the same analysis as claims brought under the ADEA. See Lightfoot v. Union Carbide Corp., 110 F.3d 898, 913 (2d Cir. 1997). We, in turn, analyze ADEA claims under the same burden shifting framework as claims brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. See Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000). Thus, we analyze an age discrimination claim brought under the State HRL and City HRL as we would any other Title VII claim.
 
 
 31
 Under this framework, first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), a plaintiff must first establish a prima facie case of age discrimination. See id. Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions. See id. If the employer articulates such a reason, the presumption of age discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action. See id.
 
 1. The Prima Facie Case
 
 32
 To establish a prima facie case of age discrimination, a plaintiff must show four things: (1) he is a member of the protected class;[3] (2) he is qualified for his position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination. See McDonnell Douglas, 411 U.S. at 802; Weinstock, 224 F.3d at 42. A plaintiff's burden of establishing a prima facie case is de minimis. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203-04 (2d Cir. 1995). The requirement is neither "onerous," Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)) , nor "intended to be 'rigid, mechanized or ritualistic.'" Meiri, 759 F.2d at 996 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). The district court concluded that Plaintiffs here had failed to meet the fourth component of their prima facie burden. Specifically, Judge Baer held that, because Plaintiffs were not similarly situated to the Delta pilots in all material respects, the differences in treatment did not prove any age-based animus. See Abdu-Brisson, 1999 WL 944505, at *3-4.
 
 
 33
 On appeal, Plaintiffs contend that Judge Baer erred when he embraced the notion that the only way a plaintiff can make out an inference of discrimination is to demonstrate that he was treated differently from other similarly situated employees. Plaintiffs concede that, while such a showing of disparate treatment is probably the most common way to create an inference of discrimination, it is not the only method. They contend that Delta management's singular, laser-like focus on the age and retirement schedule of the Pan Am pilots, most graphically represented by Harry Alger's several written derogatory comments, sufficiently evinces the discriminatory intent needed to make out the prima facie case. This argument is not without appeal.
 
 
 34
 At the outset, we concede that the case law on this particular point - whether a discrimination plaintiff may or must show disparate treatment - is confusing. Courts, including ours, have struggled with this fourth element of the prima facie case, as the language of the element itself has "gone through various iterations in the years since McDonnell Douglas was decided." Denny Chin & Jody Golinsky, Moving Beyond McDonnell Douglas: A Simplified Method for Assessing Evidence in Discrimination Cases, 64 Brook. L Rev. 659, 663-64 & n.26 (1998). Indeed, this Court's decisions have occasionally adopted apparently inconsistent positions - even within a single case. Compare Shumway, 118 F.3d at 63 ("This last element of a prima facie case may be proven by showing that a man similarly situated was treated differently." (emphasis added)) with id. at 64 ("To establish the fourth element of a prima facie case, Shumway must show that she was treated differently from 'similarly situated' males." (emphasis added)); see also Chambers v. TRM Copy Ctr. Corp., 43 F.3d 29, 37-38 (2d Cir. 1994) (noting the many types of circumstances that could create a permissible inference of discriminatory intent).
 
 
 35
 In the run of the mill discrimination cases, this may/must controversy is of little consequence because a plaintiff can make a showing of disparate treatment simply by pointing to the adverse employment action and the many employees who suffered no such fate. This is not in any way surprising, for disparate treatment is the essence of discrimination. However, cases occasionally arise where a plaintiff cannot show disparate treatment only because there are no employees similarly situated to the plaintiff. A simple example of such a case is where an employer has only one employee. If that employee were fired for a discriminatory reason, and no one was hired to replace him, he could never demonstrate disparate treatment because there is no point of comparison. Bearing in mind the flexible spirit of a plaintiff's prima facie requirement, see Meiri, 759 F.2d at 996, it stands to reason that, in such a case, the plaintiff should be able to create an inference of discrimination by some other means.
 
 
 36
 While Delta is a long way from the days when it had only a single employee, the 488 Plaintiffs in this case find themselves in a similar conundrum: they are in a class all by themselves. Because all the Pan Am pilots hired by Delta were subjected to the same three employment terms challenged in this action, and because the Pan Am pilots differed materially from the pre-APA Delta pilots in terms of their airline of origin and career expectations, there are no Delta employees similarly situated to Plaintiffs who did not suffer the adverse employment actions. Under the "must" construction of the fourth prima facie element, it would be impossible for Plaintiffs to meet their prima facie burden, because, like the lone employee in the example, they have no appropriate point of comparison with which to show disparate treatment. This presents the grotesque scenario where an employer can effectively immunize itself from suit if it is so thorough in its discrimination that all similarly situated employees are victimized.
 
 
 37
 For the foregoing reasons, we conclude that a showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the prima facie case, is only one way to discharge that burden. This position is consistent with our prior decision in Chambers, where we wrote that the inference of discriminatory intent could be drawn in several circumstances including, but not limited to:
 
 
 38
 the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.
 
 
 39
 Chambers, 43 F.3d at 37 (citations omitted).
 
 
 40
 * * *
 
 
 41
 Having reviewed the record, we conclude that Plaintiffs have produced enough evidence to meet their de minimis burden of raising an inference of discriminatory intent by Delta. While it is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination, see Woroski v. Nashua Corp., 31 F.3d 105, 109-110 (2d Cir. 1994), we have held that when "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Danzer v. Norden Systems, Inc., 151 F.3d 50, 56 (2d Cir. 1998).
 
 
 42
 Here, Plaintiffs have shown that Alger, the Delta management representative assigned to investigate and evaluate the Pan Am acquisition, made numerous comments about the age of the Pan Am pilot force, referring to them as "contaminated" and "Bad Apples." Even if his pattern of derogatory statements could be dismissed as "stray" under Woroski, by no means a certainty, when Alger's comments are viewed against the background of Delta's all-consuming interest in the age and projected retirement rates of the Pan Am pilots, they inescapably lead to the conclusion that Delta's actions may indeed have been motivated by age-based animus. Once that possibility has been demonstrated, at this stage in the analysis where a plaintiff's burden is de minimis, Plaintiffs have raised an inference of age discrimination.
 
 
 43
 Thus, while we agree with the district court that Plaintiffs satisfied the first three elements of their prima facie case, we disagree with the conclusion that Plaintiffs failed to create an inference of discrimination. Therefore, we find that Plaintiffs successfully established their prima facie case of age discrimination.
 
 2. Delta's Non-Discriminatory Rationale
 
 44
 The prima facie case is not the end of the story. If a plaintiff successfully presents a prima facie case, the employer may rebut it by articulating legitimate and non-discriminatory reasons for the adverse employment action. See Burdine, 450 U.S. at 254; Weinstock, 224 F.3d at 42. A defendant meets his burden if he presents reasons that, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." St. Mary's Honor Ctr., 509 U.S. at 509 (emphasis omitted); see also Schnabel, 232 F.3d at 88. Here, Delta has presented legitimate, non-discriminatory reasons for each of the three employment terms challenged by Plaintiffs.
 
 
 45
 a. Seniority Integration Methodology
 
 
 46
 As discussed above, at the time of the APA, the relative bidding seniority of the Delta pilots was protected in Delta's collective bargaining agreement with ALPA. Before Delta could offer the Pan Am pilots bidding seniority positions above those of new hires, Delta and ALPA had to amend the collective bargaining agreement. Indeed, the APA itself expressly provided that an amendment to the ALPA collective bargaining agreement was a condition precedent to the closing of the acquisition. Delta has presented evidence that it accepted the modified status ratio methodology "because of its belief that it was a reasonable methodology," and "because it believed that this reasonable methodology was likely to be approved by ALPA." Both of these reasons are undeniably legitimate and non-discriminatory.
 
 
 47
 b. Post-Retirement Medical Benefits
 
 
 48
 Prior to entering into the APA, Delta required ten years of service before a pilot qualified for fully-paid post-retirement medical benefits. In August 1991, Delta waived the requirement for all pilots who reached the age of fifty by January 1992, so long as they were on the Delta seniority list by August 27, 1991. Delta did not extend this grandfather clause to Plaintiffs, who were not integrated into the seniority list until November 1991. Delta's stated reason for this was that the service requirement was a company-wide policy initiated to reduce the costs of providing medical benefits. An extension of the grandfather clause would undoubtedly increase the cost of the benefit. Such financial motivations are legitimate business reasons for an employment action, even where "the motivating factor is correlated with age." Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993).
 
 
 49
 c. Pay Disparity
 
 
 50
 When Delta hired Plaintiffs, it did so at their existing Pan Am pay rates with scheduled increases to Delta's higher pay rates staggered over three years. Delta has produced deposition testimony that the reason behind this initial disparity was that under its then-existing financial conditions, Delta could not afford the additional costs. These economic concerns are legitimate business reasons for the initial pay disparity.
 
 
 51
 3. Plaintiffs' Evidence of Defendant's Actual Discriminatory Motives
 
 
 52
 Once the employer has articulated non-discriminatory reasons for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory. See St. Mary's Honor Ctr., 509 U.S. at 510-511; Weinstock, 224 F.3d at 42.
 
 
 53
 The Supreme Court illuminated this requirement in Reeves, 120 S.Ct. 2097, and this Court recently had the opportunity to apply Reeves in the summary judgment context. See Schnabel, 232 F.3d 83. In Schnabel, we interpreted Reeves to reject any categorical rule requiring age discrimination plaintiffs to offer, in addition to their prima facie case and evidence of pretext, further evidence that age discrimination was the actual motivation in order to satisfy their burden. See id. at 90. Once a plaintiff has made a showing that the defendant's asserted reason for the employment action was false, Reeves mandates "a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel, 232 F.3d at 90 (quoting Reeves, 120 S.Ct. at 2106). However, Reeves in no way relaxed the requirement that plaintiffs make a showing that the defendant's proffered explanations were pretextual.
 
 
 54
 Having thoroughly reviewed the record before us, we can find no evidence to suggest that Delta's stated non-discriminatory reasons for the challenged employment actions were false. Therefore, we are led to the conclusion that summary judgment was appropriate in this case.
 
 
 55
 Plaintiffs attempt to rebut Delta's explanations for the seniority integration methodology by pointing out that when a merger occurs, the negotiations on seniority integration are conducted very differently, with the pilot unions from each airlines negotiating directly. Plaintiffs claim the Pan Am pilots should have been negotiating directly with ALPA. Of course, the APA in this case was not a merger. Delta acquired specific Pan Am assets, eventually hiring less than one-third of Pan Am's 2,600 pilots. Plaintiffs' analogies to seniority integrations after other airline mergers are thus inapposite.
 
 
 56
 Plaintiffs do not otherwise contest Delta's assertions that it agreed to the modified status ratio methodology because it seemed reasonable, given the circumstances, and because ALPA was willing to make the necessary concessions. Plaintiffs have presented no evidence that Delta believed the Pan Am pilots should have received a more favorable integration, or that ALPA would have been willing to make greater concessions at the expense of its own members.
 
 
 57
 As for the post-retirement medical benefits and pay disparity, Plaintiffs have again failed to produce any evidence to suggest that Delta's stated financial rationale was pretextual. There is no evidence in the record that Delta's management was not concerned with containing costs of the acquisition, or that Delta's shareholders would have been willing to accept reduced profits in order to ramp up Plaintiffs' salaries to Delta levels and to extend the waiver of the service requirement for post-retirement health evidence. The written comments of Alger - which, in truth, are not only the centerpiece, but the entirety of Plaintiffs' case - are not sufficient to establish that Delta's stated financial rationale was a ruse.
 
 
 58
 * * *
 
 
 59
 Although Plaintiffs met their de minimis burden of establishing a prima facie case of age discrimination, they have failed to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false. See Weinstock, 224 F.3d at 50. The plain reality is that these employment actions were business decisions reflecting the grim economic realities affecting Delta and Pan Am at the time. Delta took full advantage of Pan Am's financial misfortunes, giving Plaintiffs the unenviable choice of joining Delta as second-class citizens or hanging on with Pan Am, which had already filed for bankruptcy. While we sympathize with the pilots who were impaled on the horns of this dilemma, we can find no actionable misconduct by the defendants.
 
 CONCLUSION
 
 60
 We have considered the appellants' remaining contentions and find them to be without merit. Accordingly, we AFFIRM the order of the district court granting summary judgment to the defendant.
 
 
 
 NOTES:
 
 
 [1]
 ALPA finds itself a defendant in this action only because it was joined as a co-defendant by Delta, pursuant to Fed. R. Civ. P. 19, as its presence was necessary for complete relief between the parties.
 
 
 [2]
 The methodology used the number of Delta pilot positions anticipated (before the Pan Am acquisition) as of year end 1992 to account for the Delta pilots' expectation of significant job growth within the airline, which, as of the fall of 1991, had not yet occurred.
 
 
 [3]
 While one must reach the age of forty before falling under the protection of the ADEA, see 29 U.S.C. § 631(a), the employment provisions of the State HRL apply to all employees over the age of eighteen, see N.Y. Exec. Law § 296(3-a)(a), and the employment provisions of the City HRL do not have any specific age limitation, see N.Y. City Admin. Code § 8-107(1).