**Rose VENTI, Plaintiff,**

v.

**EDS, Defendant.**

**No. 00–CV–6616L.**

United States District Court, W.D. New York.

Dec. 13, 2002.

266

Donna Marianetti, Irving Place, Rochsester, NY, for plaintiff.

Adam W. Perry, Hodgson, Russ, Andrew, Woods & Goodyear, Buffalo, NY, Vicki L. Gillette, Plano, TX, for defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

## INTRODUCTION

Plaintiff Rose Venti ("plaintiff") commenced this action against her employer, defendant EDS, alleging that EDS took adverse employment actions against her and eventually terminated her on account of her age, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 ("ADEA"), and the New York Human Rights Law, N.Y. EXEC. L. § 296 *et seq.* ("NYHRL"). Before the Court is EDS's motion for summary judgment brought pursuant to FED. R. CIV. P. 56. For the reasons that follow, EDS's motion is granted.

## BACKGROUND

In October 1999, EDS terminated plaintiff as part of its 1999/2000 company-wide reduction-in-force ("RIF"). At the time, plaintiff was working in EDS's Global Compute Frameworks Group and reported to managers Michael Boggs and Ed Jacques. Plaintiff began working for EDS in 1994 at the age of 44, when she was recruited by EDS to leave Xerox after 13 years of service. Xerox and EDS had entered into an outsourcing agreement pursuant to which EDS provided certain services to Xerox and hired certain Xerox employees. From 1994 through 1996, plaintiff worked as the administrative assistant for a Division Vice President in EDS's Corporate Strategic Securities group. From 1996 through 1998, she worked in EDS's Disaster Recovery group as a Business Analyst/Disaster Recovery Specialist. Following a conflict with a co-worker, plaintiff transferred to the Global Compute Frameworks Division in 1998, where she remained until her termination in October 1999.

Plaintiff alleges that EDS "had a plan" to restructure the business so as to replace older employees with a younger energetic population. Dkt. # 12, *Exhibit F,* at 38–39, 46, 233–34. She claims that Jacques and Boggs, motivated by age discrimination, engaged in a course of discriminatory conduct beginning in February 1999 that culminated in her termination as part of the RIF. Dkt. # 16, at ¶¶ 20–22. She alleges that Jacques and Boggs stripped her of her job responsibilities and refused to train her, thereby making her more susceptible to termination. *Id.* at ¶ 21.

After reviewing the pleadings and materials submitted on the motion, I find that plaintiff has produced insufficient evidence to support an inference that EDS's proffered reasons for taking the actions it did were pretextual and based on age related considerations. Plaintiff's conclusory allegations of EDS's discriminatory intent are insufficient to overcome EDS's strong showing that it had legitimate nondiscriminatory reasons for its actions. On this record, no rational fact-finder could return a verdict in plaintiff's favor, and summary judgment is warranted.

## DISCUSSION

### A. Timeliness of Plaintiff's Claims

Initially, I address EDS's contention that many of plaintiff's claims are time-barred. Based on plaintiff's allegations, most of the acts about which she complains occurred more than 300 days before she filed her EEOC charge on June 16, 2000, that is prior to August 21, 1999. Plaintiff alleges that all of her claims are timely pursuant to the continuing violation exception to the ADEA because EDS engaged in an ongoing policy of discrimination.

First, the Supreme Court's recent decision in *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153

L.Ed.2d 106 (2002), appears to preclude application of the exception in cases like this one. *Coffey v. Cushman & Wakefield,* No. 01 CIV. 9447, 2002 WL 1610913, *2 (S.D.N.Y. July 22, 2002) ("Contrary to the prior rule in this Circuit, the statute of limitations thus bars relief for such acts even if they are related to other actionable conduct that is not time-barred and might otherwise be considered part of a continuing violation.").[1] In *Morgan,* the Court held that "discrete discriminatory acts are not actionable if time barred, even where they are related to acts alleged in timely filed charges." *Morgan,* 122 S.Ct. at 2072.

■ In any event, even assuming plaintiff could invoke the continuing violation exception after *Morgan* in this case, she misconstrues the exception and submits no evidence that EDS engaged in an ongoing policy of discrimination. The continuing violation exception to the ADEA provides that if a plaintiff "files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination," the statute of limitations is extended "for all claims of discriminatory acts committed under that policy." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997); *see also Harris v. City of N.Y.,* 186 F.3d 243, 250 (2d Cir.1999).

■ To invoke the doctrine, a plaintiff must show either (1) "specific ongoing dis-

criminatory policies or practices," or (2) "specific and related instances of discrimination [that] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998) *quoting Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). "As a general rule, the courts of this circuit do not favor continuing violation arguments." *Alfieri v. SYSCO Food Servs.-Syracuse,* 192 F.Supp.2d 14, 22 (W.D.N.Y.2001) *citing Cavallaro v. Corning, Inc.,* 93 F.Supp.2d 334 (W.D.N.Y. 2000); *see also Lloyd v. WABC–TV,* 879 F.Supp. 394, 399 (S.D.N.Y.1995).

■ Here, plaintiff fails to allege any "specific ongoing discriminatory policies or practices" by EDS in her complaint or otherwise, and her conclusory allegations are wholly insufficient to establish that policy or practice. *Weeks v. N.Y. State Div. of Parole,* 273 F.3d 76, 91 (2d Cir. 2001). Plaintiff contends that a continuing violation occurred because she alleged a number of instances of discrimination between February 1999 and her October 1999 termination by the same "managerial chain of command." Specifically, plaintiff points to her exclusion from a quarterly meeting, the split of her employment group into two groups, the transfer of certain job responsibilities to others, and EDS's alleged refusal to train her, as evidence of a policy. However, more is need-

---

1. *See also Allah v. N.Y. Dep't of Parks & Recreation,* No. 01–9114, 47 Fed. Appx. 45, 48 n. 1, 2002 WL 31119698, *2 (2d Cir. Sept.25, 2002) (unpublished summary order) ("A recent Supreme Court's decision casts some doubt on the continued existence of a continuing violation exception if the continuing violation does not create a hostile environment.") *citing Morgan,* 122 S.Ct. at 2072; *Johnson v. Buffalo Police Dep't,* No. 02–7105, 46 Fed. Appx. 11, 13, 2002 WL 31004726, *2 (2d Cir. Sept.6, 2002) (unpublished summary

order) ("We have previously applied the continuing violations doctrine so that if a plaintiff files a timely agency charge about a particular discriminatory act committed in furtherance of an 'ongoing policy of discrimination,' the statute of limitations is extended 'for all claims of discriminatory acts committed under that policy.' *See Weeks v. N.Y. State Div. of Parole,* 273 F.3d 76, 82 (2d Cir.2001). It appears, however, that the Supreme Court has foreclosed use of the continuing violations doctrine in this context.") *citing Morgan,* 122 S.Ct. at 2069–73.

ed to secure the protection of the continuing violation doctrine, *see Weeks,* 273 F.3d at 91, *quoting Quinn,* 159 F.3d at 766 ("[t]he events pleaded, though embroidered with adjectives and adverbial phrases, are few and unlinked; they are 'not continuous in time with one another or with the timely acts that she has alleged' "), particularly here, on a motion for summary judgment motion.

The law is clear that to invoke the continuing violation doctrine on summary judgment, plaintiff must submit admissible evidence of "specific" or "identifiable" discriminatory customs or practices, or specific and related acts that are tantamount to such customs or policies. *See Lightfoot,* 110 F.3d at 907 ("[a]lthough the mere allegation of the existence of [a discriminatory] policy would be sufficient to withstand a challenge for failure to state a claim, something more is required to avoid summary judgment on the issue").

Here, the events complained of were isolated and disjointed, and would not, if proven, amount to a discriminatory policy for purposes of the exception. *See Alfieri,* 192 F.Supp.2d at 22, *quoting Quinn,* 159 F.3d at 766 ("[E]ven if there were multiple incidents of discrimination here, the Second Circuit has held that 'multiple incidents of discrimination, even similar ones, that are not the result of discriminatory policy or mechanism do not amount to a continuing violation.' "). In any event, it is doubtful that any of the untimely actions by EDS could themselves be actionable as materially adverse employment actions within the meaning of the ADEA. *See Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) ("materially adverse

means a change in working conditions [that is] 'more disruptive than a mere ... alteration of job responsibilities.' ").

Therefore, only plaintiff's claims based on EDS's decision not to allow her to transfer to Amy Orr's group and its decision to terminate her pursuant to the RIF are timely because they occurred after August 21, 1999. All other claims are time-barred.[2]

## B. Summary Judgment in Discrimination Cases

When deciding a motion for summary judgment brought pursuant to FED. R. CIV. P. 56, a court's responsibility is to determine whether there are issues to be tried. *Duse v. Int'l Bus. Machs. Corp.,* 252 F.3d 151, 158 (2d Cir.2001); *see also Larsen v. NMU Pension Trust,* 902 F.2d 1069, 1073 (2d Cir.1990). Summary judgment will be granted if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Larsen,* 902 F.2d at 1073. "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' ... An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001), *quoting Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

---

2. Plaintiff may, however, rely on "the prior acts as background evidence in support of a timely claim." *Morgan,* 122 S.Ct. at 2072. Accordingly, in determining whether plaintiff submitted sufficient evidence that EDS's prof- fered reasons were a pretext for discrimination, the Court will consider the evidence plaintiff submitted regarding even untimely acts.

The general principles underlying summary judgment apply equally to discrimination actions. *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases"). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *see Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Fed. Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion).

Additionally, courts analyze ADEA claims under the same framework as claims brought pursuant to Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e, *et seq. See James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000). Age discrimination suits brought pursuant to NYHRL are subject to the same analysis as claims brought under the ADEA and Title VII. *See Abdu–Brisson,* 239 F.3d at 466. That framework involves the familiar burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

First, a plaintiff must establish a *prima facie* case of age discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action. *Abdu–Brisson,* 239 F.3d at 466; *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *James,* 233 F.3d at 154.

## C. Plaintiff's Claims

Here, plaintiff alleges that EDS discriminated against her because of her age by refusing to permit her to transfer to another position at EDS, and by terminating her as part of the 1999/2000 RIF. Plaintiff claims that EDS set her up to be fired as part of the RIF by transferring her job responsibilities to younger workers, and by failing to give her technical training.

EDS does not dispute that plaintiff established a *prima facie* case of age discrimination because she was over 40, terminated, and her former duties were absorbed by other employees, some of whom were under 40. Dkt. # 13 at 7. Nor does EDS dispute that the events alleged by plaintiff occurred. However, EDS argues that it took such actions for legitimate, nondiscriminatory business reasons and that there is no evidence that age-based animus was the motive for any of its acts.

Therefore, the pending motion turns on whether EDS submitted sufficient evidence of its nondiscriminatory reasons and whether plaintiff met her burden of producing sufficient evidence that EDS's as-

serted reasons are pretextual and that the real reason EDS took such actions was on account of her age. *See St. Mary's Honor Ctr.*, 509 U.S. at 510–511, 113 S.Ct. 2742; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000).

### D. EDS's Proffered Nondiscriminatory Reasons

■ EDS asserts that plaintiff was terminated as part of its 1999/2000 company-wide RIF because she was not performing any core technical functions, and was responsible for administrative tasks only. Dkt. # 12, *Exhibit N,* ¶ 15; *Exhibit K,* ¶¶ 14–15. In the year prior to her termination, EDS reassigned several of plaintiff's administrative responsibilities to other employees because plaintiff complained that she wanted to expand her job to include technical duties, *id., Exhibit N,* ¶¶ 5, 10; *Exhibit K,* ¶ 7, and because EDS consolidated its communications functions to one group. *Id., Exhibit N,* ¶ 11. EDS claims that it attempted to train plaintiff to perform technical skills, including web page design and maintenance, but that she had a difficult time learning those skills and lacked initiative to try to learn on her own. As a result, in August 1999 Boggs asked her to begin looking for a new job at EDS. *Id., Exhibit N,* ¶ 12; *Exhibit K,* ¶¶ 9–10, 13–15.

After looking for a new position for three months, and after virtually performing no tasks for her group, Jacques and Boggs selected plaintiff for termination when they learned that they would have to reduce Boggs's group by one employee under the RIF. *Id., Exhibit N,* ¶ 14; *Exhibit K,* ¶ 11. Plaintiff, who had recently had discussions with Amy Orr, the head of another group at EDS, about an open position, was not permitted to transfer to that position because Boggs still would have been required to terminate another employee in his group. *Id., Exhibit N,* ¶ 16. Because all of the other employees were performing vital technical or financial functions, Boggs could not afford to terminate any of them without compromising the effectiveness and productivity of his group. *Id., Exhibit N,* ¶¶ 9, 15; *Exhibit K,* ¶ 11. Additionally, Orr was restricted from engaging in any hiring once the RIF was announced. *Id., Exhibit P,* ¶¶ 4–6. Therefore, plaintiff could not have transferred to Orr's group even if Boggs had approved the transfer.

EDS also submitted strong evidence that it had no age-based animus in its business operations or in executing the RIF. In the Global Compute group in which plaintiff worked, 75 percent of the employees were over the age of 40, including plaintiff's managers, Jacques (49 years old) and Boggs (56 years old), who were the decision-makers regarding plaintiff's termination. *Id., Exhibit L,* at ¶ 5. Of the six employees who remained in plaintiff's immediate employment group following her termination, five were over the age of 40. *Id., Exhibit G,* at 10–11. Moreover, approximately one-half of the employees terminated as part of the RIF were under the age of 40. *Id., Exhibit L,* at ¶ 6.

Through these submissions, EDS introduced sufficient evidence that it had legitimate business reasons for taking the actions it did toward plaintiff and that it did not engage in age-based discrimination in plaintiff's employment group or in its execution of the RIF. Therefore, the burden shifted back to plaintiff to establish a genuine issue of material fact, either through direct, statistical or circumstantial evidence, regarding whether EDS's reasons for terminating her were false, and whether the true motive behind EDS's decisions was intentional discrimination based upon her age.

## E.   Pretext

A unanimous Supreme Court clarified a plaintiff's burden of showing pretext in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In *Reeves,* the Court examined whether a *prima facie* case of discrimination plus evidence of falsity alone could support of jury's finding for a plaintiff in a discrimination case.  In holding that it *may* be sufficient, the Court also acknowledged that, depending on the facts of each case, such evidence *may not* be sufficient as a matter of law.   The Court held that:

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.   Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves,* 530 U.S. at 148–149, 120 S.Ct. 2097.

Plaintiff misinterprets *Reeves* as having "relaxed the burden placed upon the plaintiff in demonstrating pretext concerning the defendant's articulated legitimate business reason."  Dkt. # 17 at 8. She argues that summary judgment is inappropriate because only the jury can determine whether EDS's proffered reasons are pretextual and intended to hide discriminatory intent.   Plaintiff is incorrect.

■   It is well-settled in the Second Circuit that "*Reeves* in no way relaxed the requirement that plaintiffs make a showing that the defendant's proffered explanations were pretextual." *Abdu–Brisson,* 239 F.3d at 469. "[A]fter *Reeves,* a court may, in appropriate circumstances, still grant a defendant's motion for summary judgment . . . on an ADEA claim when a plaintiff has offered only a *prima facie* case along with evidence that the defendant's stated nondiscriminatory reasons for an adverse employment action are pretextual." *Schnabel,* 232 F.3d 83 (affirming district court decision granting employer summary judgment in ADEA case); *James,* 233 F.3d at 157 (same); *see also McFadden v. State Univ. of N.Y.,* 195 F.Supp.2d 436, 446 (W.D.N.Y.2002) ("Evidence suggesting that the defendant's proffered reason is false will certainly bear upon, but is not necessarily dispositive of, that issue."). Such a determination requires "a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Schnabel,* 232 F.3d at 90, *quoting Reeves,* 530 U.S. at 143, 120 S.Ct. 2097.  In other words, an employer that has put forth a nondiscriminatory reason for its employment action is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James,* 233 F.3d at 154.   Here, there is no such evidence and none of the proffered reasons appear to be manufactured by EDS so as to avoid liability for aged-based discrimination.

■   Plaintiff claims that EDS's proffered reasons are unworthy of belief because EDS set her up to be terminated. Specifically, plaintiff alleges that EDS excluded her from a February quarterly meeting, divested her of her job responsibilities, and gave those responsibilities to Tina Milne and Lisa Hubler, two younger employees.   She also claims that EDS refused to train her, even though others were afforded training opportunities, and then blocked her transfer to another group.   Dkt. # 12, *Exhibit A,* at ¶¶ 13–16, 17–20; *Exhibit F,* at 38–39; Dkt. # 16,

¶¶ 27–35. Further, plaintiff contends that she was terminated in October 1999 as part of the RIF instead of Hubler or Milne on the ground that she lacked technical experience, when neither Boggs nor Jacques had any firsthand knowledge of plaintiff's technical expertise. Dkt. # 16, ¶¶ 3–9; 36–38; Dkt. # 12, *Exhibit F*, at 39–40. Plaintiff claims EDS took all of these actions because it had a discriminatory bias against her on account of her age.

Plaintiff fails to raise a material issue of fact regarding EDS's proffered reasons for terminating her. Her contentions regarding EDS's motive for taking the actions it did are unsupported and often times contradicted by the record evidence. Moreover, plaintiff produces little evidence, other than her own affidavit, her resume, her attorney's affidavit, and select portions of deposition transcripts, to support her argument that EDS's proffered reasons are a pretext for age discrimination. In fact, plaintiff relies primarily on her own subjective opinion about her technical skills and qualifications to rebut the well-documented and legitimate business reasons articulated by EDS in its submissions.

For instance, the record shows that plaintiff was not permitted to attend a February 1999 Global Compute meeting, during which it was her responsibility to take notes, because she was out of work on a three month medical leave with a broken wrist and foot. Dkt. # 12, *Exhibit D*, at ¶ 8. Jacques declined her offer to come to the meeting, and asked her to stay home and recuperate instead. *Id., Exhibit K*, at ¶ 8. Plaintiff offers no evidence that she was precluded from attending this meeting because of her age.

Additionally, the record demonstrates that many of plaintiff's job responsibilities were given to Milne and Hubler because plaintiff complained to her managers about performing solely administrative tasks and expressed a desire to learn technical skills, a fact plaintiff admitted at her deposition. *Id., Exhibit N*, ¶¶ 5, 7, 10; *Exhibit K*, ¶¶ 7, 9; *Exhibit F*, at 87–89, 144, 273. EDS also states that certain parts of plaintiff's job went to another group because it made better business sense for one group to maintain all of the communications pieces for the division, *Id., Exhibit K*, ¶ 7, a fact plaintiff admits EDS told her at the time it took away those responsibilities; *Id. Exhibit F*, at 87. In addition, Boggs split the U.S. Global Compute group into two areas—Service Delivery and Global Core Support—and some of plaintiff's job responsibilities were transferred to Lisa Hubler and others in Global Core Support, while plaintiff remained under Boggs's supervision in the Service Delivery area. *Id., Exhibit F*, at 181; *Exhibit G*, at 56; *Exhibit N*, ¶ 11; *Exhibit H*, at 115; *see also Exhibit 19* to Plaintiff's deposition.

Plaintiff has not submitted any evidence that her duties were reassigned on account of her age. The fact that both Milne and Hubler were under the age of 40, standing alone, is insufficient to prove discrimination. *See Faldetta v. Lockheed Martin Corp.*, No. 98 CIV. 2614, 2000 WL 1682759, * 9 (S.D.N.Y. Nov. 9, 2000) ("An allegation of replacement by a younger employee, without more, does not prove discrimination."); *see also Wado v. Xerox Corp.*, 991 F.Supp. 174, 205 (W.D.N.Y.1998), *aff'd sub nom Smith v. Xerox*, 196 F.3d 358 (2d Cir.1999) (allegation that plaintiff's duties were performed by a younger person "does not support an inference of age discrimination.").

Moreover, plaintiff's allegation that she was discriminated against because she was directed to remain in the Service Delivery group, despite the fact that some of her administrative job responsibilities went to Global Core Support, is unsupported.

Boggs explains that plaintiff was responsible for two projects, specifically an asset inventory and another related to improving communications between two EDS sites, neither of which was considered a "global" project. Dkt. # 12, *Exhibit N*, ¶¶ 8–9. Plaintiff submits no evidence that would call into question EDS's reasons for keeping her in the Service Delivery group, other than her own general assertion regarding EDS's motive. The decisions made by Boggs regarding the change in the group and plaintiff's responsibilities all appear to have been made for legitimate business reasons. There is no evidence that he took such actions on account of plaintiff's age. In fact, at least one employee transferred to Global Core Support, Dave Schmerbeck, was over the age of 40. *Id., Exhibit L,* ¶ 6.

Nor has plaintiff shown that EDS denied her training opportunities on account of her age. In fact, at her deposition, plaintiff could not identify any particular training opportunities of which she was denied. *Id., Exhibit F*, at 38. She claims she solicited job training from other members in her group, but no one offered to train her because Boggs never directed anyone to take the time to do so. *Id.* at 145–46. She asserts she "could be qualified to do anything with the right training." *Id.* at 169; 170–73.

However, the evidence in the record shows EDS attempted to train plaintiff to perform certain technical functions, but that she had difficulty learning those tasks. Jacques asked Alex Kostro to train plaintiff on how to maintain and update the Global Compute website. Plaintiff flew to Texas and trained with Kostro for a day and a half. Kostro thereafter assisted plaintiff over the phone when she returned to Rochester with follow–up questions. *Id.* at 305. Nonetheless, plaintiff told Jacques she had trouble learning the skills, and

Kostro eventually took back the web page responsibility from her. *Id., Exhibit K,* ¶ 9; *Exhibit I,* at 13–17. Moreover, Boggs attempted to give plaintiff project management training. He assigned her an asset inventory project and a communications project. However, Boggs states that plaintiff made "little progress" on both projects after a number of months. *Id., Exhibit N,* ¶ 12; *Exhibit F,* at 164–65.

Plaintiff asserts that the website training in Plano, Texas was ineffective because Kostro was not a certified trainer. She also claims other younger employees, including Lisa Hubler, were sent to more formal training, but she was not permitted to attend. Dkt. # 16, ¶¶ 12–14. Nothing in the record supports this allegation. Plaintiff has not shown that EDS denied her training opportunities on account of her age.

In addition, plaintiff has failed to submit any evidence to refute EDS's asserted nondiscriminatory reasons for not allowing her to transfer to Amy Orr's group. The record shows that plaintiff met with Boggs on August 10, who told her for the first time that she should start looking for a new job. *Id.* Boggs put her in touch with an EDS recruiter. Dkt. # 12, *Exhibit F,* at 218. Plaintiff then spent the next three months looking for another job at EDS. *Id.*

On October 25, 1999, plaintiff met with Amy Orr, the manager of a telecommunications group at EDS. *Id., Exhibit F,* deposition exhibit 32. According to plaintiff, Orr offered her a job in her group. When plaintiff told Boggs that she wanted to take the position, Boggs asked plaintiff to stay for a few weeks to finish up the asset inventory and communications project that he had assigned to her. He also wanted to speak with Orr about a transition date. *Id.* at 227. Plaintiff alleges that a few days after that discussion, Boggs asked her into his office and told her it was her

last day at EDS. *Id.* at 230. According to plaintiff, when she asked about the position with Orr's group, he told her that the position was "blocked" and that she had "been targeted." *Id.* at 230.

However, EDS submitted the affidavit of Amy Orr in which she states that her discussions with plaintiff did not result in a formal offer because Orr first needed to create a staffing request and to obtain plaintiff's manager's approval (in this case, Boggs' approval) before making a formal commitment. *Id., Exhibit P,* ¶ 4. Once the RIF was announced, she explained that she was restricted from hiring anyone, including plaintiff. *Id.* at ¶¶ 4–6.

Further, Boggs explains that, pursuant to EDS's RIF policy, if he permitted plaintiff to transfer to Orr's group, he would have been required to terminate someone else in his group. Boggs explains in detail why he could not afford to lose any of the remaining employees, so he refused to allow plaintiff to transfer. *Id., Exhibit G,* at 83–84. In addition, Boggs did not know at the time he asked plaintiff to stay to complete her projects that his group was going to be affected by the RIF. *Id., Exhibit N,* ¶ 13; *Exhibit G,* at 81; *Exhibit K,* ¶ 15.

Understandably, plaintiff believes she was mistreated because she was terminated even though she appears to have had some positive discussions concerning a transfer. However, aside from her own assumptions that EDS made the decision to terminate her because she was 49 years old, there is no evidence that age played a role in the decision-making process.

Plaintiff has not raised a material issue of fact regarding the reasons for her termination. The decision to terminate plaintiff, and not Hubler or Milne, was Jacques's decision, although Boggs concurred with the decision. *Id., Exhibit K,* ¶ 15; *Exhibit G,* at 23. Jacques explains that he examined which employees were adding value to the group and performed essential technical functions. According to Jacques, losing any of the other employees would have had a negative impact on the contractual commitments EDS had to Xerox. In addition, he made a "business decision" not to terminate Lisa Hubler, who was on maternity leave at the time of the RIF, instead of plaintiff because Hubler already knew her job and performed it well. Hubler's job required technical functions on a software reduction project, and he believed, both from his own observations and those of plaintiff's prior manager, Judy Richey, that plaintiff had trouble learning new technical skills. *Id., Exhibit K,* ¶¶ 13–14. In addition, Jacques believed plaintiff had personality conflicts that would interfere with performing Hubler's job. *Id.* at 13.

Plaintiff denies that she had "personality conflicts" with coworkers and claims EDS never told her about such conflicts until now. She also argues that EDS improperly relies on an incident in which she was physically assaulted by another employee as evidence that she has such conflicts. She claims the employee who pushed her was a "perpetual problem due to his temper" and that, "upon information and belief," he was sent to anger management class. Dkt. # 16 at ¶¶ 15–19. This evidence does not raise an inference of pretext either. There are several references in the record to plaintiff's personality conflicts with co-workers, including references in some of her past performance appraisals. Dkt. # 12, *Exhibit F,* at 59–60, 69–71, 97–98, 115, 119–24, and exhibit 2 (entries dated 5/97, 6/97–7/97, 8/97, 9/97, 5/4, and 7/27/98), exhibit 4, exhibit 6, exhibit 8 (pp. 10, 13) and exhibit 12(p.3) thereto. In addition, before Jacques took over Richey's position, Richey informed him that plaintiff had personality conflicts in Disaster Recovery. *Id., Exhibit M,* at ¶ 6.

Therefore, plaintiff has failed to show that this reason for terminating plaintiff instead of Hubler was false.

With respect to Tina Milne, only one-third of her job responsibility was as Jacques's administrative support, and the other two-thirds was as Greg Bales's administrative support. *Id., Exhibit J*, at 88. Bales was in another group and not part of Jacques chain of command. Therefore, Jacques did not have the authority to terminate Milne under the RIF. *Id., Exhibit K*, ¶ 12.

Boggs concurred in Jacques's decision to terminate plaintiff because the others in Boggs's group had skills that were vital to the function of the group. Boggs submitted detailed evidence regarding each employee's skill set and job function. He explained that there was no one in his organization whom he could have let go and still maintain proper service to Xerox. *Id., Exhibit G*, at 18–19, 24. He believed plaintiff had no technical experience that would have supported the group. *Id.* at 24. Further, the evidence shows Boggs could not have selected Hubler for termination because she fell under Kostro's headcount for purposes of the RIF. *Id., Exhibit H*, at 125.

Plaintiff does not refute any of this evidence. Instead, she alleges neither Boggs nor Jacques knew about her prior technical background at EDS or Xerox, and submitted her resume as evidence that she

had such skills. Dkt. # 16, *Exhibit A*, ¶¶ 4–8. However, plaintiff's subjective perceptions of her own technical abilities are not sufficient to show pretext and avoid summary judgment. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (1996); *Shapolia v. Los Alamos Nat. Lab.*, 992 F.2d 1033 (10th Cir.1993); *Richane v. Fairport Cent. Sch. Dist.*, 179 F.Supp.2d 81, 87 (W.D.N.Y.2001). In any event, her allegations regarding her previous technical skills are not legally compelling. Plaintiff admitted at her deposition that she did not have technical operations experience to perform the functions in Global Compute and that she would have needed training. Dkt. # 12, *Exhibit F*, at 144–45. Plaintiff also conceded that others in her group had more technical expertise than she did. *Id.* at 144–45, 148–51. Further, plaintiff's deposition supports the conclusion that plaintiff's job responsibilities were primarily administrative in nature, and that plaintiff exaggerated her technical background. *Id.*, at 68–69; 131–39; *see also* Exhibits 9–10 to Plaintiff's deposition.[3]

Boggs admits that he did not investigate what kind of technical experience plaintiff had with EDS before concurring in the decision to terminate her. *Id., Exhibit G*, at 66. However, he explains that it was not a question of who he could train in the future to fill the needs of his group, but who already was performing the necessary functions. *Id.* at 67–68. He also notes that the skills plaintiff may or may not

---

**3.** Nor does the record support plaintiff's assertion that she performed technical skills while working in Disaster Recovery. Plaintiff's senior manager at that time, Judy Richey, submitted an affidavit in which she states that plaintiff worked for Disaster Recovery as an apprentice Business Analyst and reported to Alan Montante. Richey explained that plaintiff did not perform any technical duties required for the Disaster Recovery drills. According to Richey, plaintiff did not have the skill set to perform the technical functions

required. Dkt. # 12, *Exhibit M*, at ¶ 4. In fact, Richey received complaints from Montante and others who worked with plaintiff about her difficulty in following the Disaster Recovery process. *Id.* at ¶ 4. When Richey transferred plaintiff to the Global Compute Group after her conflict with another employee, Richey informed Jacques that plaintiff would be a better Communications Specialist because it required only minimal, if any, technical skills. *Id.* at ¶ 6.

have had in Disaster Recovery would not necessarily translate to those needed in Global Compute, a fact plaintiff glosses over in her papers.

Even if plaintiff had technical skills and EDS choose not to utilize them or did not thoroughly investigate her technical training, that evidence by itself would still be insufficient to withstand this motion. The record reflects that it made good business sense for the efficient function of Boggs's group to terminate plaintiff instead of allowing her to transfer to Orr's group or terminating another employee. This decision, even if unfair, does not support a claim under the ADEA. "The ADEA prohibits discrimination, not poor judgment." *Richane,* 179 F.Supp.2d at 89; *see also Montana v. First Fed. Sav. and Loan Ass'n of Rochester,* 869 F.2d 100, 106 (2d Cir.1989) (federal courts do not have a "roving commission to review business judgments") *quoting Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987); *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988) ("[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons"); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985) (courts "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process"); *Graefenhain,* 827 F.2d at 20 ("A business decision need not be good or even wise. It simply has to be nondiscriminatory...").

Plaintiff has completely failed to submit any credible evidence that the real reason EDS took the actions it did was because plaintiff was over 40 years old. *Slattery,* 248 F.3d at 94; *see also Schnabel,* 232 F.3d at 91 (summary judgment to defendant affirmed "[b]ecause plaintiff has presented no evidence from which the inference could be drawn that he was dis-

criminated against on the basis of age"). Plaintiff submits a stray comment made by Alex Kostro during a phone conference with plaintiff and two other employees. Kostro commented that a number of employees in the U.S. Global Compute group were pregnant. When plaintiff commented that she was not pregnant, Kostro responded that she was "too old" to be pregnant. Dkt. # 12, *Exhibit F,* at 41. Plaintiff never reported to EDS management that Kostro made the comment, and could not identify any other comment that Kostro made about her age. *Id.* at 42.

"To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir.1996); *see also Wado,* 991 F.Supp. at 212 ("[s]tatements made or actions taken by nondecisionmakers, or actions unrelated to the decision-making process, cannot be used to support an allegation of pretext."). This stray comment was not connected to EDS's decision to terminate plaintiff, and the meeting at which it was said was not related to the RIF. In fact, Kostro had no responsibility or input in the decision to terminate plaintiff. Dkt. # 12, *Exhibit I,* at 11.

Plaintiff also alleges that when Boggs told her she "was targeted" she "felt like there was a segment of a population that was targeted when he used the word targeted." Dkt. # 12, *Exhibit F,* at 43. However, she admitted that Boggs never said that those over 40 were targeted for termination and that Boggs never did anything to her to make her believe he had a bias against older people. *Id.* at 43–44.

Plaintiff also contends that she "kind of heard that there was a mentality or philosophy to restructure EDS with a younger energetic population." *Id.* at 44–45. She claims to have heard EDS CEO Dick

Brown say something to that effect in a conference video, though she could not recall his exact words and did not produce the video or a transcript of it. Plaintiff maintains there was "generalized talk among employees" that EDS targeted individuals for lay off because it was looking for a younger work force. *Id.* at 233–34. However, she could not say which employees made the comment, and relied again on a Spring of 1999 videotape and newsletter in which she claims she heard Dick Brown say EDS "is going to go through a transformation change and . . . looking for a younger work force." *Id.* at 234. She could not remember the date of the newsletter and did not keep a copy. *Id.* at 237. Nor could she recall any details about the video. *Id.* at 240.

Plaintiff's unsubstantiated allegations regarding Brown's alleged comments and unspecified employee gossip do not raise an inference of discrimination.[4] "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Anyhow, though comments about "changing the corporate culture made by top executives" can be probative of alleged discriminatory intent by lower level managers, such statements must be "considered in the context of the case as a whole . . . ." *Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 93–94 (2d Cir.2001).

Plaintiff failed to show that EDS's legitimate, nondiscriminatory reasons for taking the actions it did were unworthy of belief. The record as a whole simply would not lead a reasonable jury to conclude that EDS fired plaintiff because of her age.

"As the Second Circuit has made clear, in a case where a plaintiff does not credibly call into question an employer's non-discriminatory explanation for its motives, summary judgment for the defendant continues to be appropriate." *Richane,* 179 F.Supp.2d at 87, *citing Schnabel,* 232 F.3d at 90; *see also Slattery,* 248 F.3d at 94.

## CONCLUSION

For all the foregoing reasons, EDS's motion for summary judgment (Dkt.# 12) is granted, and plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED.

---

**4.** *Furthermore, the record contains evidence that Brown had no aged-based bias. Shortly after Dick Brown became CEO of EDS in December 1998, he hired Troy Todd, who was 70 years old at the time, as Executive Vice President of Leadership and Change Manage-* ment, *which includes EDS's Human Resources department. Id., Exhibit K,* ¶ *16;, Exhibit L,* ¶ *9. Dick Brown himself was 52 years old in 1999, and a member of the protected class, when he allegedly made such comments. Id., Exhibit L,* ¶ *8.*