George **NICHOLLS**, Plaintiff,

v.

**PHILIPS SEMICONDUCTOR MANUFACTURING, Philips Electronics North America, and NXP Semiconductors, Defendants.**

**Case No. 07–CV–6789 (KMK)(GAY).**

United States District Court,
S.D. New York.

Jan. 14, 2011.

---

3. Carling is not a partner of CCM.

Steven Felsenfeld, Esq., The Hilpert Law Offices, Croton–On–Hudson, NY, for Plaintiff.

Joseph DeGuiseppe, Jr., Esq., Bleakley, Platt & Schmidt, LLP, White Plains, NY, for Defendants.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge:

George Nicholls ("Nicholls," or "Plaintiff") brings this action against Philips Semiconductor Manufacturing ("PSM"), Philips Electronics North America ("PENA"), and NXP Semiconductors ("NXP"), (collectively, "Defendants"), alleging discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure. For the reasons stated herein, Defendants' motion is granted.

## I. Background

### A. Facts

Plaintiff was born on August 31, 1945, and was 59 years old at the time the critical events allegedly took place. (Decl. of Steven Felsenfeld in Opp'n to Mot. for Summ. J. ("Felsenfeld Decl.") Ex. I.) Plaintiff began his career as an engineer in 1967, and was employed from that time until his voluntary resignation in August 2005, at a semiconductor manufacturing plant in Fishkill, New York. (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 3, 5, 9–10, 78; Aff. of George A. Nicholls ("Nicholls Aff.") ¶ 3.)[1] The plant was operated by PSM, and, before that, by MiCRUS and IBM, with whom Plaintiff was previously employed until PSM bought the Fishkill plant in 2000. (*Id.* ¶¶ 3–5, 9–10.) Plaintiff was never an employee of NXP, which purchased the Fishkill plant in 2006, after Plaintiff resigned. (*Id.* ¶ 7.) At the time of his resignation, Plaintiff held the position of E–4 Senior Process Engineer, working with "TEOS (Tetraethyl-ortho-silicon) tools" and other tools at the Fishkill facility. (Defs.' 56.1 ¶¶ 11–12; Pl.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶ 11.)

On several occasions, Plaintiff was unfavorably reviewed by his supervisors for his sarcastic approach to problem-solving on collaborative projects. (Defs.' 56.1¶ 13; Aff. of Joseph DeGuiseppe, Jr. in Supp. of Defs.' Mot. for Summ. J. ("DeGuiseppe Aff.") Exs. C–E.) For example, in his 2003 Performance Review, Plaintiff's supervisor, Jerry Mase ("Mase"), noted that "[Plaintiff] is often negative and contrarian, in some cases even before he understand [sic] the facts and detail. As a leader in the department I expect just the opposite. We've had conversions [sic] in previous years with no improvement. This is a requirement to maintain acceptable performance in 2004." (Defs.' 56.1 ¶ 14; DeGuiseppe Aff. Ex. C, at 0007.) Plaintiff's overall rating for 2003 was "Fully Acceptable, Declining." (Defs.' 56.1 ¶ 15; DeGuiseppe Aff. Ex. C, at 0012.)[2] In 2004, another supervisor, Mary Matera–Longo ("Matera–Longo"), commented that Plaintiff "[i]s a skilled, articulate communicator but the negative, skeptical comments he interjects in the conversation makes [sic] it difficult for others to provide own [sic] input. Also tends to hilite [sic] barriers to progress rather than to build on 'one step at a time' solutions." (DeGuiseppe Aff. Ex. E, at 1209.) Plaintiff's overall rating for 2004 was "Partially Meets, Well Placed," a rating with which Plaintiff claims he did not agree. (*Id.* at 1211; Pl.'s 56.1 ¶ 18.)[3]

In Fall 2004, PSM conducted a benchmarking study and concluded that the Fishkill facility was "dramatically overstaffed." (Dep. of Dr. Wendy Arienzo ("Arienzo Dep.") 53:5–55:15.) During that time, Dr. Arienzo, then the General Manager of the Fishkill facility, determined that a reduction in employees was necessary for PSM to meet its financial targets. (Defs.' 56.1 ¶ 21; Arienzo Dep. 73:3–6.) In October 2004, Dr. Arienzo and her staff implemented a ranking process. (Arienzo Dep. 82:13–83:8.) In December 2004, a voluntary reduction in force ("VRIF") was offered, which was followed by a performance-based reduction in force ("RIF")

---

**1.** Where there is no dispute, the Court will cite to Defendants' Rule 56.1 Statement.

**2.** This rating was in the third tier, below "Excellent," and "Very Good." (DeGuiseppe Aff. Ex. C, at 0012.)

**3.** This rating was in the fourth tier, the three higher ones being "Excels," "Exceeds," and "Fully Meets." (DeGuiseppe Aff. Ex. E, at 1211.)

based on the October 2004 rankings, in January 2005. (Defs.' 56.1 ¶ 23; Arienzo Dep. 80:13–17, 92:7–20.) Plaintiff's employment status was not affected by this VRIF/RIF. (Defs.' 56.1 ¶ 24.)

After the October 2004 ranking process, Mase—Plaintiff's second-level manager at the time—and Matera–Longo, his direct supervisor, discussed the need to get Plaintiff more involved in the day-to-day activities on the factory floor. (Dep. of Jerry Mase ("Mase Dep.") 98:6–99:4.) Both Mase and Matera–Longo believed that Plaintiff needed to focus on more specific technical assignments, as opposed to higher-level projects, so that his contributions would be more concrete and recognized. (*Id.* 98:23–99:1; DeGuiseppe Aff. Ex. D, at 1256.) In December 2004, Matera–Longo prepared an Individual Development Plan ("IDP") for Plaintiff to assist and guide him in developing the requisite skills for his new job responsibilities. (DeGuiseppe Aff. Ex. D.) In accord with the provisions of the IDP, Plaintiff began to spend more time on the TEOS functions, which required more day-to-day factory floor activity, while moving away from his former duties, such as cost accounting. (Dep. of George Nicholls ("Nicholls Dep.") 101:6–106:16; Mase Dep. 98:23–99:1.) Plaintiff believed that the IDP was fair. (Nicholls Dep. 105:24–106:5.)

In early 2005, Mase became Plaintiff's direct supervisor as a result of a reorganization of the engineering department, and, therefore, was responsible for monitoring Plaintiff's progress on his IDP and his new job responsibilities. (*Id.* 91:5–17; Mase Dep. 106:15–108:21.) Mase met with Plaintiff several times in 2005 to discuss specific targets and goals, and, by all accounts, was willing to work with Plaintiff to make sure his workload was manageable. (Mase Dep. 108:11–21; Nicholls Dep. 148:4–6, 150:8–16.) In May 2005, Mase

noted in Plaintiff's IDP that Plaintiff was making progress, and that "[t]he TEOS assignment has been [a] catalyst to positive change." (DeGuiseppe Aff. Ex. D, at 1078.) Plaintiff believed his relationship with Mase at the time was "[v]ery good." (Nicholls Dep. 146:18–20.)

In June and July of 2005, another extensive ranking process was conducted at the Fishkill site. (Defs.' 56.1 ¶ 36.) Plaintiff, along with 53 other PSM employees, was ranked as a "bottom" performer as a result of this process. (*Id.* ¶ 37.) Around this time, Fishkill management determined that the initial VRIF/RIF packages had not, by themselves, moved the facility close to its financial targets. (Arienzo Dep. 107:11–23.) In addition to other cost-cutting measures, management decided to conduct another reduction in force. (Defs.' 56.1 ¶¶ 41–42; Arienzo Dep. 160:23–161:4, 196:4–198:16.) At the time, the protocol with respect to terminations at PSM, whether in connection with a reduction in force or other types of terminations, was to submit all terminations for review and approval by a committee called the Employment Termination Oversight Committee ("ETOC"). (Defs.' 56.1 ¶ 43; Aff. of Judee Williams ("Williams Aff.") ¶¶ 2–3.) The ETOC consisted of PSM's Senior Vice President of Human Resources, several human resources specialists from locations around the country, and a PSM in-house lawyer. (Williams Aff. ¶ 2.) Its purpose was to ensure the fairness and reasonableness of all termination decisions, and to ensure that there was no appearance of bias—whether based on gender, race, or age—in termination decisions. (*Id.* ¶¶ 2–3.)

In anticipation of the upcoming VRIF/RIF, Fishkill HR personnel prepared a proposed ETOC sheet, dated July 22, 2005, to obtain advice on rankings and proposed RIF selections. (*Id.* ¶ 5.) In the document,

several bottom-ranked employees, including Plaintiff, had a "RIF" designation next to their names.[4] (*Id.*; *id.* Ex. A.) Fishkill HR personnel subsequently discussed this document with two ETOC members, Judee Williams and Susan Mustacchio, to obtain their feedback. (*Id.* ¶ 6; DeGuiseppe Aff. Ex. J.) Williams and Mustacchio advised HR that there were several issues with the document, particularly that the rankings were not, in many cases, supported by the employees' most recent performance reviews. (Williams Aff. ¶ 6.; Dep. of Michelle Bibeault) ("Bibeault Dep." 166:5–17.) To illustrate the point further, Williams prepared a document, "ETOC 101," that explained the inconsistencies associated with the ETOC document and advised that termination decisions based on least seniority, rather than ranking, were more likely to pass muster. (Williams Aff. ¶ 7; *id.* Ex. B.) Bibeault, who was providing HR advice to Fishkill management, prepared a powerpoint presentation entitled "Pre-ETOC—22 July 2005," which also highlighted the misalignment between the new rankings and the employees' performance reviews, and recommended the implementation of a VRIF, followed by a RIF based on seniority. (Defs.' 56.1 ¶ 53; DeGuiseppe Aff. Ex. J.)

The VRIF program was offered between August 3 and August 17, 2005, with a uniform script used to inform all employees of its availability. (Defs.' 56.1 ¶¶ 58–60; DeGuiseppe Aff. Exs. K, L; Arienzo Dep. 331:6–21.) However, around the

same time, scripts were being circulated among managers at the Fishkill facility that would notify employees of their performance rankings (bottom, middle, or top). (Felsenfeld Decl. Exs. V, W, Y.) These scripts were tailored for the different ranking levels, and at least one of the managers, Susan Mustacchio, expressed her hope that they would "encourage the right employees to consider the VRIF." (DeGuiseppe Aff. Ex. M.) Therefore, although a uniform script was used to announce the availability of the VRIF to all employees, the Parties dispute the effect, if any, the near-simultaneous "Rating and Ranking Feedback" scripts had on employees' decisions whether take the VRIF. (*Id.*; Pl.'s 56.1 ¶ 58.) A total of 38 employees, including Plaintiff, opted to take the VRIF. (Williams Aff. Exs. C–F, H.) Of those 38, 14 had received a bottom ranking. (*Id.* Exs. C–F, H.) Thirty-four percent of them (13) were under the age of 40.[5] (*Id.* Exs. C–F, H.) Following the VRIF offering, an additional 5 employees were terminated via involuntary RIF. (Defs.' 56.1 ¶ 66.) The same RIF package was provided to all terminated employees regardless of whether it was voluntary or involuntary. (Dep. of Cheryl Brooks ("Brooks Dep") 40:9–15.)

On August 8, 2005, before he took the VRIF, Plaintiff met with Mase to review his job performance and to discuss upcoming deadlines for pending projects. (Nicholls Dep. 167:10–19.) Mase noted that while Plaintiff had demonstrated some improvement, he was still manifesting a sar-

---

4. Although Mase denies that he was aware that Plaintiff had been designated as a candidate for the RIF, several sources indicate that it would most likely have been Plaintiff's direct supervisor who would have made the recommendation. (Williams Aff. Ex. I, at 875; Dep. of Michelle Bibeault ("Bibeault Dep.") 166:19–22 (noting that it was the managers who selected candidates for the RIF).)

5. The Court's analysis of the figures provided in Defendants' submissions yields slightly different percentages from those offered by Defendants. For example, while Defendants state that 37% of the employees who accepted the VRIF were under 40, the Court arrived at the figure of 34%. (Williams Aff. ¶ 10.) Therefore, where the Court's calculations differ from those of the Defendants, the Court will substitute its own numbers.

castic and negative attitude, and that he was having issues meeting target completion dates. (Mase Dep. 109:4–111:19; DeGuiseppe Aff. Ex. P, at 1260.) Mase also noted that Plaintiff needed to increase the frequency of face-to-face interactions with his colleagues, and that he needed to improve his communicating with others when events occurred that required adjusting project schedules. (Mase Dep. 165:1–166:19.; DeGuiseppe Aff. Ex. P, at 1260.) Overall, this was not a very favorable review of Plaintiff's performance, but it was supported by a considerable amount of detail. (DeGuiseppe Aff. Ex. P, at 1260.) Additionally, this review was no worse than Plaintiff's previous reviews, which criticized Plaintiff for his sarcastic and negative attitude. (DeGuiseppe Aff. Exs. C, E.) Mase claims that at the time of this meeting, he had not seen any documents identifying Plaintiff for a RIF. (Mase Dep. 144:20–145:3.) However, even though Mase may not specifically have told Plaintiff that he would be fired as a result of his bottom ranking, or that he would be fired if he did not meet his upcoming deadlines, Plaintiff contends that he was told by Mase that he could be "RIF'd" for not meeting his deadlines, and that Mase suggested that Plaintiff consider the VRIF, because if his performance did not improve he could be affected by another RIF. (Nicholls Dep. 109:17–110:19, 115:18–116:2.) Plaintiff believed that the deadlines being imposed upon him at that time were unreasonable and were being used to force him to resign. (Nicholls Dep. 115:6–17.)

Following the August 8 meeting, Plaintiff was scheduled to meet with Mase once more on August 12, to further discuss some of Plaintiff's project deadlines. (Nicholls Dep. 167:15–168:19; Mase Dep. 163:1–17.) However, on August 11, one day prior to this follow-up meeting, Plaintiff notified Mase via email that he had decided to accept the VRIF. (Nicholls Dep. 224:6–225:1.) Although, as Defendants point out, Plaintiff testified that he did not rely on any details that Mase provided him about the VRIF in deciding whether to take it (Mase referred him to the Human Resources department to get the necessary information), Plaintiff claims that his decision was influenced by Mase's suggestions that failure to meet new deadlines could result in the loss of his job through a RIF. (Defs.' 56.1 ¶ 79; Nicholls Dep. 115:15–116:2, 226:1–7.) However, Plaintiff never notified Mase of his concerns regarding the reasonableness of the deadlines before making his ultimate decision to resign, (Nicholls Dep. 187:5–18), and made no mention of his views about these deadlines in his August 11 email. (DeGuiseppe Aff. Ex. Q.)

After notifying Mase that he had accepted the VRIF, Plaintiff prepared a document that recommended certain employees to take over his workload. (Nicholls Dep. 188:22–24.) Plaintiff recommended several engineers to Mase, some of whom were younger, and at least one of whom was older than himself, and Mase agreed with most of those recommendations. (Pl.'s 56.1 ¶ 186; Nicholls Dep. 226:21–227:8; DeGuiseppe Aff. Ex. R.) Each of these employees had been hired and was employed by PSM before Plaintiff accepted the VRIF. (Pl.'s 56.1 ¶ 89.) On September 27, 2005, Plaintiff signed a severance agreement and release, and on October 3, 2005, he received $13,487.80 in severance pay. (Nicholls Dep. 221:13–21; DeGuiseppe Aff. Exs. S, T.) Plaintiff's employment with PSM officially ended on September 30, 2005. (Nicholls Dep. 16:2–4.) At the time Plaintiff signed the release, he acknowledges he was unaware that he may have had a claim for age discrimination; however, in early 2006, after speaking to other former PSM employees who had been terminated through an involuntary

RIF and were suing for age discrimination, Plaintiff filed the instant action. (Nicholls Dep. 204:19–208:21, 266:5–20.)

## B. Procedural History

Plaintiff filed this suit on July 27, 2007. (Dkt. No. 1.) Defendants answered on November 19, 2007. (Dkt. No. 5.) After completing discovery, Defendants moved for summary judgment on April 1,2010. (Dkt. No. 20.) Defendants also moved to strike Plaintiff's Local Rule 56.1 Statement, as well as portions of Plaintiff's other submissions. (Dkt. No. 33.) On December 16, 2010, the Court held oral argument.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted where it is shown "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (same). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dall. Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003); *see also Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir.2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,* 432 F.3d 428, 433 (2d Cir.2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's

claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). "A fact is 'material' when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Electric Corp. v. N.Y.C. Transit Auth.,* 735 F.Supp. 1205, 1212 (S.D.N.Y.1990). A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548.

"A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Indeed, "[b]ecause writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* Still, it is "beyond cavil that summary

judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001). In fact, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Thus, the Supreme Court has "reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted).

### B. Analysis

#### 1. Framework

■ The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[6] The Supreme Court recently has held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." *Gross v. FBI Fin. Servs., Inc.,* — U.S. —, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009). Thus, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse action." *Id.* This re-

placed the pre-*Gross* rule under which plaintiffs had to establish that age was *a* motivating factor in adverse employment actions. *See, e.g., Holtz v. Rockefeller & Co.,* 258 F.3d 62, 76 (2d Cir.2001).

■ ADEA cases, like those brought under Title VII, are analyzed under the burden-shifting model set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Abdu–Brisson,* 239 F.3d at 466; *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000).[7] Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a prima facie case of discrimination. *See Abdu–Brisson,* 239 F.3d at 466. To establish a prima facie case, a plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Id.* The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See id.* at 468. The burden at this stage is one of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once the defendant meets this burden, the presumption of discrimination "drops out of the picture." *Id.* at 510–11, 113 S.Ct. 2742. The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered rea-

---

6. This prohibition is "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

7. The Second Circuit has held that while "*Gross* changes the latter part of [the *McDonnell Douglas* ] formulation by eliminating the mixed-motive analysis," it "did not . . . reject the *McDonnell Douglas* burden-shifting

framework for ADEA cases altogether." *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 106 (2d Cir.2010) (internal citations omitted). Thus, the Second Circuit has concluded that courts "remain bound by," and have "no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit." *Id.*

son is a pretext and that "age was the 'but-for' cause of the challenged adverse employment action." *Gross*, 129 S.Ct. at 2352; *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

### 2. Prima Facie Case

Starting with the question of whether Nicholls has established a prima facie case of age discrimination under the ADEA, it is clear that Nicholls satisfies the first two elements described above: he was 59 years old at the time the events in question took place, making him a member of the protected class, and no party disputes that Nicholls was qualified to do the work required of his position as a Senior Engineer, despite his allegedly negative and sarcastic attitude. It is less clear, however, whether Nicholls has established the third element. To satisfy the third element—that he was the victim of an adverse employment action—Nicholls maintains that he suffered constructive discharge at the hands of Defendants. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") 10–15.)

■■■ "A 'constructive discharge,' satisfying the third element of the prima facie case, occurs when an employer 'deliberately makes an employees's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (internal quotation marks omitted)); *see also Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir.2003) ("An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."). "This burden is not an easy one to carry." *Alfieri v. SYSCO Food Servs.-Syracuse*, 192 F.Supp.2d 14, 23

(W.D.N.Y.2001). To establish a constructive discharge, a plaintiff must demonstrate that his working conditions were "'so difficult or unpleasant that a reasonable person in the [plaintiff's position] would have felt compelled to resign.'" *Terry*, 336 F.3d at 152 (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996)); *see also Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("Every job has its frustrations, challenges, and disappointments.... An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions.... He is not, however, guaranteed a working environment free of stress."). Finally, the standard to be applied to constructive discharge claims is objective; "[s]uccess does not depend upon the plaintiff's subjective beliefs." *Phillips v. Gen. Dynamics Corp.*, 811 F.Supp. 788, 792 (N.D.N.Y.1993); *see also Torrech–Hernández v. Gen. Electric Co.*, 519 F.3d 41, 52 (1st Cir.2008) ("The standard for assessing a constructive discharge claim is an objective one: it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held." (internal quotation marks omitted)); *Pena*, 702 F.2d at 325 (noting that conditions must have been so unbearable that a "reasonable person" would have been compelled to resign) (internal quotation marks omitted).

■■■ Here, Plaintiff's theory of constructive discharge is that Defendants engaged in a systematic course of action wherein they gave him unfairly negative performance evaluations, changed his job responsibilities, ranked him as a bottom performer, then imposed unreasonable deadlines upon him, and that the VRIF "was the only option [that he] was being given." (Nicholls Dep. 115:11–12.) These allegations, however, are insufficient. As the Second Circuit has made clear, con-

structive discharge is not established through evidence that Plaintiff was "dissatisfied with the nature of his assignments," that Plaintiff "feels that the quality of his work has been unfairly criticized," or that Plaintiff's "working conditions were difficult or unpleasant." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993); *see also Grube v. Lau Indus. Inc.*, 257 F.3d 723, 729 (7th Cir.2001) ("[N]egative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions."); *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485–86 (10th Cir. 1995) (noting that prima facie case was not established where plaintiff did not allege or demonstrate that her low ranking, which was not in line with her prior rankings, was undeserved or the result of discriminatory animus); *Spence*, 995 F.2d at 1149–50, 1156–58 (finding no constructive discharge where plaintiff's supervisors "harangued" and "ranted and cursed" at plaintiff.); *Alfieri*, 192 F.Supp.2d at 24 (holding that employee was not compelled to resign for constructive discharge purposes where she feared she would be terminated in the future if her performance did not improve, even where criticism of her work was allegedly frequent and unjustified); *Katz v. Beth Isr. Med. Ctr.*, No. 95–CV–7183, 2001 WL 11064, at *9, *14 (S.D.N.Y. Jan. 4, 2001) (holding that employee, who exhibited behavioral issues at work, failed to establish constructive discharge where she was yelled at, subjected to unfair criticism, and received unfavorable schedules and work assignments, and was told to either retire or work part time if she did not like her schedule); *Sastri v. KLM Royal Dutch Airlines*, No. 92–CV–5534, 1995 WL 746458, at *2, *4 (S.D.N.Y. Dec. 15, 1995) (finding no constructive discharge where employer imposed allegedly impossible deadlines on plaintiff because "such changes are part of the ordinary vicissitudes of being a member of the work force, particularly at a high level supervisory position like that held by plaintiff"); *cf. Chertkova*, 92 F.3d at 84, 89 (denying defendant's motion for summary judgment with respect to plaintiff's constructive discharge where supervisor yelled at plaintiff and repeatedly told her she would no longer be with the company, plaintiff was arbitrarily and severely criticized despite her strong performance, and the company had a recognized practice of falsely documenting patterns of failure in order to get rid of undesirable employees).

Plaintiff has not demonstrated that he had essentially no choice but to resign from PSM. In fact, Plaintiff had an opportunity, on August 12, 2005, to further discuss the deadlines with Mase—an opportunity he chose to forego, opting instead to accept the VRIF the day before the meeting was scheduled to occur. Plaintiff claims that further discussions would have been futile, and that "the handwriting was on the wall" that Defendants no longer valued him as an employee. (Nicholls Aff. ¶ 39.) This claim, however, is belied by his supervisors' continued efforts to work with him on his projects and to discuss and manage his workload.

Plaintiff also makes much of the fact that the Fishkill managers prepared different scripts for their employees, depending on their ranking, and that at least one of the managers noted that these scripts might be useful in encouraging the "right" employees to consider taking the VRIF. (DeGuiseppe Aff. Ex. M.) However, notifying an employee of his or her performance ranking does not constitute constructive discharge, whether or not the employee agrees with the results of that evaluation. *See Stetson*, 995 F.2d at 360 (noting that constructive discharge generally cannot be established merely because an employee feels that his work has been unfairly criti-

cized); *Alfieri*, 192 F.Supp.2d at 24 ("Although plaintiff alleges that she was criticized both frequently and unjustifiably, even hypercritical supervision and unfair and unwarranted treatment are by no means the same as constructive discharge." (internal quotation marks and alterations omitted)). Further, nothing about Plaintiff's bottom ranking, which was based on a points system and was consistent with his evaluations in the previous two years, appears inherently unfair or discriminatory, given the ongoing issues Plaintiff's supervisors were having with his sarcastic and negative attitude. Plaintiff had many avenues available to him to rectify any perceived issues he had with his employer—he was certainly not subject to conditions so intolerable that he was "compelled to resign," *Sastri*, 1995 WL 746458, at *3, and he had, objectively speaking, "free choice" regarding whether to continue his employment relationship, *Torrech–Hernández*, 519 F.3d at 50 (citation omitted). Therefore, Plaintiff has failed to establish the third element of the prima facie case because he has not alleged facts sufficient to rise to the level of a constructive discharge.

■ Even assuming, however, that Plaintiff can establish the third element of a prima facie case of age discrimination, there is little to no evidence establishing the fourth element—that Defendants' actions were motivated by discrimination based on age. To begin, Plaintiff offers no direct evidence of any age-based discrimination, comments, or other improper conduct directed specifically at or related to Plaintiff. Instead, Plaintiff relies on statistical figures derived from lists of employees who were given a bottom ranking, and who were thus at some point designated for a RIF, to demonstrate that age bias played a role in the rankings. (Pl.'s Mem. 10–12; Felsenfeld Decl. Ex. I.) From this

raw data, which has not been analyzed by an expert, Plaintiff argues that because the rankings were allegedly based on age, and a script was allegedly created for the purpose, in part, of encouraging the bottom-ranked employees to take the VRIF, a disproportionate number of older workers were targeted for termination. There is room for debate about whether such raw statistical data ever can make out a prima facie case. *Compare Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir.1999) (noting that in disparate treatment cases, "a plaintiff may [ ] present statistical findings as circumstantial evidence of intentional discrimination"), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir.2006), *vacated*, 554 U.S. 84, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008); *Stratton v. Dep't for the Aging for N.Y.*, 132 F.3d 869, 877 (2d Cir.1997) (noting that expert statistical analysis is not required in individual disparate treatment cases); *Bruno v. W.B. Saunders Co.*, 882 F.2d 760 (3d Cir.1989) (noting that statistical evidence in individual disparate treatment cases "need not be … finely tuned" and that "the usefulness of statistics will depend primarily upon their relevance to the specific decision affecting the individual plaintiff" (internal quotation marks omitted)), *with Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F.Supp.2d 230, 245 (E.D.N.Y.2010) ("Statistical information … may be considered as circumstantial evidence supporting the necessary inference of discrimination. However, statistical proof alone cannot ordinarily establish a prima facie case of disparate treatment." (internal quotation marks, citations, and alteration omitted)); *Baron v. N.Y.C. Dep't of Educ.*, No. 06–CV–2816, 2009 WL 1938975, at *6 (E.D.N.Y. July 7, 2009) (noting that while statistical evidence, when combined with other evidence of discriminatory animus, may be sufficient to establish a prima facie

case, "statistics alone are insufficient in a disparate-treatment [case] because an individual plaintiff must prove that he or she *in particular* has been discriminated against" (internal quotation marks and alteration omitted) (emphasis in original)).

Beyond this legal question, however, Plaintiff's data is fundamentally flawed.[8] Defendants establish that of the 38 employees who accepted the VRIF, only 14 were ranked in the bottom 10%, while 24 were ranked as middle or top performers. (Williams Aff. Exs. C–F, H.) Additionally, from the undisputed data in the record, 34% of the employees who took the VRIF were under the age of 40, a greater percentage than the percentage of employees under 40 in the overall workforce. (*Id.* Exs. C–F, H.) Plaintiff counters that a more accurate analysis would focus not on the entire workforce at the Fishkill facility, but rather only on the engineering department, to which Plaintiff belonged. (Pl.'s 56.1 ¶ 65.) Plaintiff argues that of the 69 employees in the engineering department, 9 were ranked in the bottom 10%, with an average age of 51, while 6 were ranked in the top 10%, with an average age of 42. (Pl.'s Mem. 2.)[9]

However, the statistical data Plaintiff provides is misleading, even if the Court agrees that the analysis should be limited to the population of Fishkill engineers. First, the sample sizes at issue are too small to draw any definitive statistical conclusions about age differentials. *See Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F.Supp.2d 98, 116 (S.D.N.Y.2009) (citing cases which note that smaller sample sizes allow for less persuasive inferences of discrimination to be drawn); *Jackson v. Univ. of New Haven*, 228 F.Supp.2d 156, 164–65 (D.Conn.2002) (noting, in disparate impact case involving sample size of 14 people, that "exceedingly small sample sizes often result in statistically unreliable evidence"). Second, the statistics themselves do not support a story that could persuade a reasonable juror that discrimination occurred, as Plaintiff omits a number of important details from his discussion. For example, Plaintiff does not address the middle-ranked engineers at all. The average age of the 53 middle-ranked engineers is 47 years, and they range in age from 26–67. (Felsenfeld Decl. Ex. I.) Of the 53 middle-ranked engineers, 41(77%) are over the age of 40, and 19(36%) are over the age of 50. (*Id.*) Most notably, five of the middle-ranked engineers are older than the oldest bottom-ranked employee, who was 61.[10] (*Id.*)

---

**8.** Aside from this data, Plaintiff claims that younger employees were hired to take over his job, but Plaintiff concedes that the employees to whom he refers were hired well before he accepted the VRIF and that it was *Plaintiff* who recommended them to take over portions of his workload after his departure. (Pl.'s 56.1 ¶ 89; DeGuiseppe Aff. Ex. R.) Thus, this purported piece of circumstantial evidence is unavailing.

**9.** Plaintiff goes on to state that this age difference is the "converse" of what one would expect statistically, because older workers who have been employed for a longer period of time would be expected to have greater skills than younger workers. (Pl.'s Mem. 2.) This is so especially because the older workers "would have survived the early round of employee attrition based on inferior skills," and thus a higher percentage of them would be expected to demonstrate a high level of skill. (*Id.*) This statement is considerably misguided, ignoring a host of other factors that determine an employee's performance, and the individual differences between employees. In any event, to the extent that Plaintiff himself survived previous RIFs, including one within months before the RIF under which Plaintiff left, this is inconsistent with Plaintiff's claim that Defendants were motivated to terminate Plaintiff because of his age.

**10.** Conversely, the youngest bottom-ranked employee is younger than the youngest top-ranked employee. (Felsenfeld Decl. Ex. I.)

Finally, one of the top-ranked employees is older than more than half of the bottom-ranked employees. (*Id.*) In sum, there is no evidence that Defendants' ranking process was the result of age bias.[11]

Thus, even if Plaintiff believes that he was targeted by his employer—that his low ranking was unjustified and that unreasonable deadlines were purposely imposed upon him—there is no evidence in the record to support the claim that this alleged targeting was motivated by Plaintiff's age. In fact, during oral argument, counsel failed to identify any evidence that demonstrated that Plaintiff received his rankings because of his age, let alone that he was targeted for the RIF because of age discrimination.

### 3. Burden–Shifting Analysis

██ In the interest of completeness, the Court will assume, arguendo, that Plaintiff has established a prima facie case of age discrimination and continue the *McDonnell Douglas* burden-shifting analysis.

Once the plaintiff has made out a *prima facie* case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions. If the employer articulates such a reason, the presumption of age discrimination dissolves, and the burden shifts back to the

plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the [but-for] reason for the adverse employment action.

*Abdu–Brisson,* 239 F.3d at 466 (internal citation omitted); *see also Gross,* 129 S.Ct. at 2352 (noting that plaintiffs must demonstrate, by a preponderance of the evidence, that age was the but-for cause of the adverse employment action). Here, Defendants have offered valid, nondiscriminatory reasons for their actions. As an initial matter, Defendants have argued that the measures they took in implementing the RIFs were necessary to maintain the competitiveness of the Fishkill plant, which was hindered by over-staffing and over-budgeting. (Defs.' 56.1 ¶¶ 20–23, 40; Arienzo Dep. 107:11–23.) The plant's eventual closure in 2009 confirms the dire financial situation that Defendants were facing at the time of the reductions in force. (Defs.' 56.1 ¶ 8.) Defendants conducted two RIFs between December 2004 and September 2005, each one initially allowing employees to resign on a voluntary basis, followed with involuntary terminations. (Defs.' 56.1 ¶¶ 23, 42.) Plaintiff was not affected by the first RIF, despite his barely average rankings over the years. (DeGuiseppe Aff. Exs. C, E.) Plaintiff chose to take the VRIF in August 2005, but the

11. This is so notwithstanding Plaintiff's EEOC Determination Letter, which stated that it was more likely than not that Plaintiff had been subjected to age discrimination. (Felsenfeld Decl. Ex. HH, at 2.) The Determination Letter lacks any legal basis for its conclusions, and is factually inaccurate in at least one instance, and thus is not enough to deny Defendants' motion. *See Field v. Tonawanda City Sch. Dist.,* 604 F.Supp.2d 544, 555 (W.D.N.Y.2009) (noting that district courts have discretion in determining what weight, if any, to give to an EEOC determination, and that a letter should be disregarded where it lacks a probative factual or proper legal basis). In particular, the Determination Letter appears to credit Plaintiff's assertion that Defendants hired younger employees to replace him. (Felsenfeld Decl. Ex. HH, at 2.) However, the employees referred to in the letter were already hired at the time when Plaintiff opted to accept the VRIF. In fact, as noted, it was Plaintiff himself who recommended that these employees take over some of his job duties upon his termination. (Pl.'s 56.1 ¶ 89; DeGuiseppe Aff. Ex. R; Nicholls Dep. 188:22–189:17.) Additionally, the EEOC letter appears flawed in that it also found probable cause for a retaliation claim that Plaintiff did not bring. (Felsenfeld Decl. Ex. HH, at 2.)

bottom-ranking he received in July 2005—one reason he cites for taking the VRIF—was not significantly out of sync with his past unfavorable evaluations. And, although Plaintiff contends that he resigned because "the writing was on the wall," he has not articulated how Defendants' treatment of him changed over time to create an inference that age discrimination was the but-for cause of their actions toward him, nor has he demonstrated that age discrimination motivated Defendants' decision to implement the RIFs at all. Regarding the allegedly impossible deadlines that were being imposed on Plaintiff, the record indisputably shows that Defendants were in fact willing to work with Plaintiff to adjust them. Again, it is worth noting that at the oral argument held before the Court, Plaintiff's counsel was unable to articulate any evidence (as distinct from supposition) supporting Plaintiff's assertion that his ranking, or the ranking process generally, was the result of age discrimination. Accordingly, Plaintiff has failed to demonstrate that Defendants' reasons are mere pretext and that age discrimination was the "but-for" cause of their actions. Therefore, because Plaintiff has failed to show pretext, or, ultimately, to meet his burden, his claim is dismissed.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment. The Clerk of the Court is respectfully directed to terminate the pending motions and close this case. (Dkt. Nos. 20, 33.)[12]

SO ORDERED.

---

12. Defendants' motion to strike is denied as moot.